# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION | § | |
| | § | |
| v. | § | Case No. 4:15-CV-338 |
| | § | Judge Mazzant |
| SETHI PETROLEUM, LLC and | § | |
| SAMEER P. SETHI | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On June 22, 2016, Plaintiff Securities and Exchange Commission (the "SEC") filed its Emergency Motion for Show Cause Hearing to Hold Defendant and Others in Contempt (the "Motion") (Dkt. #138). In the Motion, the SEC requested that the Court order Sameer P. Sethi ("Sameer"), Praveen Sethi ("Praveen"), and John Weber ("Weber") to appear at a hearing to show cause why they were not in contempt of the Court's orders (Dkt. #138 at p. 9). The Court ordered expedited briefing on the Motion (Dkt. #140).

On June 28, 2016, Sameer filed his response (Dkt. #144). On June 29, 2016, Weber filed his response (Dkt. #147). On July 1, 2016, the SEC filed its reply (Dkt. #149). On July 5, 2016, Praveen filed his response (Dkt. #151). On July 7, 2016, the SEC filed its reply (Dkt. #152). On July 11, 2016, the Court granted the SEC's motion, and set the show cause hearing for August 1, 2016 (Dkt. #153).

At the hearing, the Court ordered the parties to provide further briefing on the issue of whether the interests that Cambrian Resources LLC ("Cambrian") sold were, in fact, securities. On August 2, 2016, the SEC filed its brief on the issue (Dkt. #161). Also on August 2, 2016, Praveen, Sameer, and Weber each filed briefs on the issue (Dkts. #163, #164, #165).

## BACKGROUND

On May 14, 2015, the Court granted the SEC's emergency ex parte request and issued a temporary restraining order, asset freeze, and other injunctive relief (the "TRO") against Sethi Petroleum, LLC ("Sethi Petroleum") and Sameer (Dkt. #11). The Court also appointed a receiver over Sethi Petroleum (Dkt. #12). On May 26, 2015, the Court issued an Agreed Order Granting Preliminary Injunction, Asset Freeze, and Other Relief (the "Preliminary Injunction") (Dkt. #23). The Preliminary Injunction states that,

> Defendants Sethi Petroleum, LLC and Sameer Sethi and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are restrained and enjoined from directly or indirectly, including, but not limited to, through any entity owned or controlled by Defendants, participating in the issuance, purchase, offer, or sale of any security . . .

*Id.* at p. 4.

In the Motion, the SEC contends that the day after the Court entered the Preliminary Injunction, a former employee, Weber, "formed Cambrian . . . for the explicit purpose of holding the company for Sameer and his family." (Dkt. #138 at p. 1). The SEC asserts that "Cambrian is, in fact, operated and controlled by Sameer and engaged in the offer and sale of securities in violation of this Court's preliminary injunction against him and his associates." (Dkt. # 138 at p. 1). The SEC further alleges that "[u]nder Sethi's direction and control, Cambrian is currently raising money from the public in oil and gas securities offerings. Sameer Sethi's sales staff at Cambrian is paid salary and commissions – all in cash – by Sameer's father, Praveen." (Dkt. #138 at p. 1).

In Sameer's response he contends that "he did not run afoul of the Agreed Order since there is no proof that he sold securities . . . because there is not clear and convincing evidence that the circumstances involve the offer of a 'security.'" (Dkt. #144 at p. 2). Sameer argues that

"[t]he Court lacks jurisdiction over the issue of Cambrian Drilling LLC because the Cambrian Drilling Partnership XVI exists as a Joint Venture . . . [t]herefore, Cambrian is not a security within the meaning of the Securities Act or Exchange Act." (Dkt. #144 at p. 2). In their responses, both Weber and Praveen also assert that Cambrian was not involved in the sale of securities because it was doing business as a joint venture general partnership, which is presumed not to be a security (Dkts. #147 at p. 6; #151 at p. 3).

At the August 1, 2016 hearing, Annette Del Rio ("Del Rio"), who had previously worked for Sameer and Praveen, described how she came to work as the Cambrian office manager and how she extensively participated in running the office. She stated that she believed that Sameer was in charge, and that she believed that Weber was only the owner of Cambrian "on paper." Del Rio stated that Sameer told her that he could not be associated with Cambrian because of the SEC's lawsuit. Del Rio also testified that Sameer was in the office more often than Weber, who would sometimes fill in for Del Rio when she took a day off. She also stated that she saw Sameer speak to potential investors on the phone a couple of times, and that when he did so, he used fake names instead of his own.

Del Rio also testified that she and the other employees were paid with cash, usually by Praveen, but once or twice by Weber. Del Rio explained that she believed that Cambrian only had an investor or two, and that Sameer trained the salespeople. Del Rio alleged that Sameer had to sign off on final decisions.

George Palmer ("Palmer") was a sales employee at Cambrian who also testified at the hearing. Palmer testified that he believed that Sameer was his boss, that he was paid $500 per week, and that he was paid every other week, in cash. Palmer also stated that while Del Rio was the individual who handed him his salary, he observed that the money was given to Del Rio by

Praveen or Weber. Palmer explained that the salesmen split commissions and that the commissions were paid in cash as well.

Palmer stated that he represented to potential investors that Cambrian already had leases, and that Sameer was aware that he was making this representation. Palmer explained that the terms of the agreement with potential investors would allow them to become a joint venturer and give them the ability to remove Cambrian from its management role by a majority vote. However, Sameer told him that investors would "check the box" that would keep Cambrian manager of the joint venture. Palmer said that Sameer told him a change in management would never happen. When describing the type of investors they were seeking to attract, Palmer stated that Sameer said during sales training that "readers are not buyers."

Palmer also explained that Sameer represented that the special service that was unique to Cambrian was its ability to find the right wells to invest in. Palmer explained that a potential investor did not need oil or gas experience, and that it was easier to sell to individuals without such experience. According to Palmer, Cambrian expected investors to rely on its expertise. Palmer also said that the sales people did not tell potential investors that they could be held liable for more than the amount that they invested.

Veronica Powell ("Powell"), an employee of the company that Cambrian rented their office from, also testified at the hearing. Powell witnessed the comings and goings at Cambrian, and performed some tasks for Cambrian as part of her employment. Powell stated that Sameer had an access card, although it was unclear to her who signed the form requesting the access card.

Justin Lewis ("Lewis"), another former salesman who worked at Cambrian, also testified at the hearing. Lewis stated that he was interviewed and hired by Sameer and that he attended

daily training taught by Sameer in the mornings. He explained that this training usually lasted for at least an hour, and that the salesmen spent the rest of the day calling potential investors. Lewis testified that the salesmen were given a list of potential investors to contact on Mondays, and he estimated that they each called about 150 people per day. Lewis explained that sometimes Weber would also teach the salesmen about oil and gas terminology and pertinent legal issues. Lewis stated that Sameer was in the office more often than Weber. Lewis said that the source of his salary was from investors at Kingsbridge Capital LLC ("Kingsbridge").

Lewis also said that he told potential investors that the money invested would be pooled, and that potential investors expected a profit. Lewis explained that when he spoke to one investor, Clark, he did not tell Clark that he could potentially be liable for more than the amount that he invested. Lewis said that when Clark invested, Lewis told him about Cambrian's success in the gas and oil industry, and that Cambrian was a long-standing company that had worked with Hess, Conoco, and Exxon. Lewis also stated that on more than one occasion Weber told the salespeople to be honest, although he would not characterize this as a "theme" of Weber's.

Ontario Rowe ("Rowe") is another former Cambrian salesman who testified at the hearing. Rowe stated that both Sameer and Weber interviewed him, and that Del Rio called and informed him that he had gotten the job. Rowe alleged that Sameer stated that he was the "contract CEO of Cambrian," although Sameer never explained what that meant. Rowe stated that Sameer trained the sales people three to four times per week between February 2016 and June 2016. Rowe said that he was paid $700 a week and that if Sameer was not in the office, he would lead the sales training. Rowe testified that he did not tell the salespeople to do anything that Sameer had not already told them to do. Rowe explained how he described "the gauntlet" to potential investors as Cambrian's method to ensure that it only invested in wells that would be

profitable. According to Rowe, the gauntlet involved getting several different experts to analyze potential wells extensively. Rowe also testified that Sameer explained that he could not talk to potential investors or have any dealings with potential investors because of ongoing litigation.

Beverlyn Jorman ("Jorman"), a Cambrian investor, also testified at the hearing. She testified that she had no experience in the oil and gas industry and that she would not know how to hire an expert in the industry. Jorman stated that although she read a book that Rowe suggested would be helpful to learn more about oil and gas, she is not an expert in drilling. Jorman stated that Rowe told her Cambrian had a staff of over 100 sales people. Jorman also said that Rowe represented that Cambrian already had investors, had a market niche with Chevron, and had a billionaire interested in investing who had experienced enormous success in the industry. Jorman stated that she was told that the risk in investing with Cambrian was less than it would be with other companies because Chevron would be picking the wells. She was also told that Cambrian had been successful in the industry for sixteen years. Jorman explained that she was told that she would get voting rights and would be able to vote for the wells in which Cambrian would invest. Jorman testified that when she asked what would happen if other investors wanted Cambrian to invest in poorly chosen wells, she was told that Cambrian would not let this happen. Jorman alleged that Rowe told her several times that Cambrian was close to meeting its goal of raising $5 million from thirty-two investors/venturers, and that when she inquired further, Rowe would only say that Cambrian needed between $200,000-$300,000 to reach the goal.

When asked if she knew that she could be liable for more than the $62,500 that she invested in Cambrian, Jorman stated that she did not know that, and would not assume that, because she did not consider herself to be in an "ownership situation." When it was pointed out

that the paperwork she signed referred to Jorman as a partner, Jorman explained that she viewed this as being partners with thirty-two other investors, not as a partner in the whole company. Jorman also explained that she asked for information about the other investors, but that Cambrian refused to provide her with the information.

Sameer was also called to testify at the hearing, but exercised his Fifth Amendment rights to almost all of the questions that were asked. Sameer did say that he did not sign the form requesting an access card to Cambrian's offices. However, in response to every material question of fact that Sameer was asked, he invoked his Fifth Amendment rights.

Praveen, Sameer's father, testified that he had not read the Preliminary Injunction until the Motion was filed in June 2016, and that he did not know what actions the injunction barred until he read the order. Praveen said that when he appeared before the Court previously concerning his motion requesting that the Court unfreeze his assets or move to alter the preliminary injunction, he had not read it. Praveen testified that he replaced Weber as the manager for Cambrian for a short period of time, beginning in April 2016 and ending in June 2016.

Praveen stated that he did not know that Julissa Martinez, the wife of his son Sameer, both of whom were living with him, was the manager of Kingsbridge. Praveen testified that he had not heard the name Kingsbridge until the day of the August 1, 2016 hearing. The SEC introduced Government's Exhibit 12, which lists Julissa Martinez and Praveen Sethi as managers of Kingsbridge. Praveen maintained that he did not have any relationship with Kingsbridge and that he did not know if anyone in his family had a relationship with the company.

Praveen also maintained that he did not help form Cambrian, and that he just gave Weber money to pay for the company's startup costs. Praveen maintained that Sameer was volunteering

and helping Weber with the training of employees. Praveen explained that Weber told him that he was starting a company and asked Praveen to help financially, so Praveen loaned the company $60,000-$80,000. Praveen testified that it was Weber's idea to start the company and that he loaned Weber the money, without documentation, because Weber was trustworthy. Praveen asserted that he did not personally hire anyone, did not train anyone, and that he did not make any management decisions. He explained that he never withdrew money from a Cambrian account, and that he did not know anything about the company beyond that it was involved in oil and gas. Praveen asserted that he did not do any bookkeeping or draft any documents related to the company. Praveen insisted that he only went to the Cambrian office a few times, and that he intended for the loan to be repaid. Praveen also explained that he only became the manager of Cambrian because Weber was hospitalized, but once the Motion was filed, he resigned.

Praveen stated that no money was ever paid back to him, and again asserted that he had lost between $60,000-$80,000. He also pointed out that he was not a named party in the SEC case, and said that his interests were only financial when he gave the loan to Cambrian. Praveen stated that he was not attempting to help his son get around the Preliminary Injunction.

Weber testified that the Cambrian funds were deposited into an account controlled by Bank of Texas, but that the bank froze the account and would not explain why it had done so. Weber demanded that the bank either tell him why the account was frozen, or let him withdraw the money. The bank then let him withdraw the money. Weber testified that there was about $49,000 and some change remaining when he withdrew the funds, even though the company had raised about $75,000 from investors. He said that some of the money raised had been spent on about two payrolls, but that the investors' money was not used as much as Praveen's money for payroll. He also said some of the investors' money had been used to pay for the costs of

maintaining the company.

Weber said that the first time he and Praveen discussed Cambrian was in the summer of 2015, when Weber came up with the idea for the company. Weber then stated that he and Praveen discussed the parameters of the Preliminary Injunction and what they could and could not do. However, Weber said that since the conversation had occurred over a year ago, he could not remember the exact conversation. Weber said that he could not remember if he had the Preliminary Injunction with him when he spoke to Praveen about it.

Weber explained that he understood that the Preliminary Injunction applied to Sameer and Sethi Petroleum. He also stated that he realized that it covered their officers, agents, employees, and all people in concert with them who receive personal service or had knowledge of it. He said that he did not think that he discussed those particular provisions with Praveen. Additionally, Weber explained that he did not think that the Preliminary Injunction applied to him, because he ceased being an officer of Sethi Petroleum on May 14, 2015, and the Preliminary Injunction was not issued until May [26], 2015, at which point he was no longer an employee of Sethi Petroleum or Sameer. He also did not think that it would have applied to Praveen, because as of May [26], 2015, Praveen also had no official connection to Sethi Petroleum or Sameer.

Weber stated that he knew Sameer was under the Preliminary Injunction but that Sameer was only looking after his father's money and how Weber was using it. The SEC introduced Governments' Exhibit 1, which demonstrated that Weber was charging Praveen for legal services that he provided for Sameer in February 2016, after the Preliminary Injunction was issued. Weber said that he had acted at the behest of Sameer's lawyers. Weber also said that he did not think that the work he did for Sameer was sufficient to trigger the definition of an

attorney within the Preliminary Injunction, since he was not Sameer's attorney of record at the time. He also said that his mindset at the time was that he was sufficiently removed from Sameer.

Also included in Government's Exhibit 1 was a request for payment from Weber, for filling in for Del Rio. Weber maintained that he filled in for Del Rio not because Sameer wanted him to "cover the phones" when she was not there, but because Weber wanted to do this of his own volition. Weber maintained that if Sameer had been controlling him, he would have been in the office from 9 a.m. to 5 p.m. every day, and that he only filled in for Del Rio because he wanted to fill in for her. However, Weber charged Praveen for this.

When Weber was asked about an email in which he stated that Cambrian was formed in Weber's name for the purpose of holding it for Sameer and his family, Weber said that this email was only a colloquial conversation and it was contingent on if, on some uncertain date in the future, Sameer could buy Weber out. When asked why Sameer did not start the company on his own, Weber said that Sameer could not do so, because of the Preliminary Injunction. Weber said that one of the reasons he had started the company was to hold it for Sameer and his family, but another reason was for his own self-interest. Weber maintained that gas prices were low at the time, and he thought that it was a good time to go bargain-hunting in the oil and gas industry.

Weber said that before Jorman and Clark invested, all of Cambrian's money came from Praveen. He said that although the money from Praveen was only a loan, the only documentation was a handshake. Weber said that Praveen was a dear friend. Weber also said that he assumed risk by signing several legal documents for Cambrian, such as the lease.

When asked again why Sameer could not have signed documents and assumed the risk instead of Weber, Weber said that it was because of the Preliminary Injunction. When asked

why this would be a problem, since Weber did not believe that what Cambrian was selling was a security, Weber said "well that is true."[1]  Weber said that there were changes that he made to Sethi Petroleum's joint venture agreement, so that the interest that Cambrian was selling would not be a security.

Weber explained that he hired a recent graduate from Harvard Law to assist him in strengthening Cambrian's memorandum so that it was clear that it was not a security. He made sure to add voting rights, he omitted the part of the document that had mentioned specific operators, and he eliminated the promise to get a specific amount of working interest.

Weber explained that Cambrian only had two investors, and these investors were cold called from a list of leads.  Praveen provided the money for the leads, although it was unclear if Praveen knew what the money was for.  Weber said that after he resigned, he remained Jorman's point of contact.  Weber said that although Jorman asked for her money back, he could not give it to her, because he had relinquished custody of the money.  Weber continued to fill in for Del Rio, but was no longer an officer of the company.

When asked for examples of times that Weber acted against Sameer's advice, he said that he picked a less ostentatious office space than what Sameer wanted.  He also said that he did not follow Sameer's hiring recommendations on a couple of occasions, and that he fired two people that Sameer wanted to keep.  Weber claimed that he has no knowledge of the current financial state of Cambrian.  Weber testified that he had quit because of his health, arguments in the office, and because the company was not making any money.

Weber explained that Sameer is an amazing salesman.  Weber said that he told Sameer repeatedly that he was not allowed to be on the phone with potential investors.  Weber also stated

---

[1] This Court is not asserting that this is an exact quote because a transcript of the hearing was not available at the time that the Court issued this Order.

that he never observed Sameer on the phone with a potential investor.

## ANALYSIS

"Courts possess the inherent authority to enforce their own injunctive decrees." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citing *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985), *cert. denied*, 474 U.S. 1056 (1986)). A court may enforce its orders through civil contempt, which is intended to compel obedience to a court order. *See In re Bradley*, 588 F.3d 254, 263 (5th Cir. 2009) ("If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil."). "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *SEC v. First Fin. Group of Texas, Inc*., 659 F.2d 660, 669 (5th Cir. 1981). In a civil contempt proceeding, the movant bears the burden of establishing the elements of contempt by clear and convincing evidence. *SEC v. Res. Dev. Int'l LLC*, 217 F. App'x 296, 298 (5th Cir. 2007) (citing *Petroleos Mexicanos v. Crawford Enter., Inc*., 826 F.2d 392, 401 (5th Cir. 1987)). "Clear and convincing evidence is that weight of proof which produces in the mind of the trier of fact a firm belief or conviction . . . so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Shafer v. Army & Air Force Exch. Serv*., 376 F.3d 386, 396 (5th Cir. 2004), *opinion clarified* No. 03-10074, 2004 WL 2107672 (5th Cir. Sept. 17, 2004).

The elements of contempt that the movant must prove by clear and convincing evidence are: (1) a court order is or was in effect; (2) the order requires certain conduct; and (3) the

opposing party fails to comply with the court order. *See Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992).[2]

The first two elements are established. The Court entered the Preliminary Injunction which prohibited Sameer and those acting with him from "directly or indirectly . . . participating in the issuance, purchase, offer, or sale of any security" (Dkt. #23 at p. 4).[3] The only question remaining for the Court is whether there is clear and convincing evidence that Sameer, Praveen, and Weber failed to comply with the Court's Preliminary Injunction.

As an initial matter, the parties all claim that their actions do not constitute a violation of the injunction, even if the Court determines that Cambrian was selling securities. Praveen argues that the SEC is basing its argument that Praveen should be held in contempt on only three facts, and that "these three facts do not establish by clear and convincing evidence that Praveen

---

[2] Weber and Praveen both claim that the injunction does not apply to them. The Preliminary Injunction states that it applies to "Defendants Sethi Petroleum, LLC and Sameer Sethi *and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise.*" (Dkt. #23). Praveen asserted at the hearing, and again in his closing brief, that he did not have actual notice of the Preliminary Injunction until the Motion was filed on June 22, 2016 (Dkt. #163 at p. 11). Praveen points out that he was not served with notice by the SEC, he is not a party to the lawsuit, and he is not a party to the Preliminary Injunction (Dkt. #163 at pp. 1-2). However, Praveen appeared before the Court in a matter related to the Preliminary Injunction when he filed his Motion to Unfreeze Assets, or in the Alternative, to Modify the Preliminary Injunction Affecting Praveen Sethi's Assets (Dkt. #65). Therefore, given the many other issues with Praveen's credibility, and the extensive evidence that Praveen knew about the Preliminary Injunction and was deliberately attempting to get around it, the Court finds that there is clear and convincing evidence that Praveen had actual knowledge of the Preliminary Injunction's limitations on the actions of Sameer, Praveen, and Weber.

Similarly, Weber asserted in the hearing that he understood the injunction only applied to persons employed by Sethi Petroleum at the time that the Preliminary Injunction was entered. Therefore, Weber did not think that it applied to him because he resigned from Sethi Petroleum before the Preliminary Injunction was entered. However, the Court finds that Weber's interpretation clearly goes against the plain language of the order. Additionally, the Court finds that there is substantial evidence that Weber was aware that the injunction applied to his conduct, since he took steps to make it appear that he, and not Sameer, controlled the operation of Cambrian.

[3] Praveen argues that the Preliminary Injunction is not enforceable because it is "vague and ambiguous with respect to whether it gives notice to Praveen that his alleged conduct constitutes 'acting in concert' for the purposes of the sale of any security." (Dkt. #163 at p. 11). Specifically, Praveen states that "[t]he language of the Preliminary Injunction does not contain the specific detail required to show that non-party Praveen is included in the group of persons restrained." (Dkt. #163 at p. 11). The Court finds that the plain language of the Preliminary Injunction is clear and unambiguous.

violated the Preliminary Injunction." (Dkt. #163 at p. 10).[4] Praveen also states that the SEC failed to establish that he acted in concert with Sameer in violation of the Preliminary Injunction (Dkt. #163 at p. 11). Weber states that there is no evidence that Sameer acted as an agent of Cambrian, other than in screening job applicants (Dkt. #165 at p. 2).[5] Likewise, Sameer argues that even if the Court finds that Cambrian's interests were securities, there still is no proof, much less proof by clear and convincing evidence, that Sameer was offering, selling, or otherwise transacting those securities. (Dkt. #164 at p. 8). However, the Court disagrees.

The Court finds that there is an extraordinary amount of evidence that demonstrates that the creation and operation of Cambrian by Sameer, Praveen, and Weber was nothing more than an attempt to evade the Court's injunction and continue utilizing Sameer's skills in selling securities. The Court finds that the following facts demonstrate that there is clear and convincing evidence that the creation and operation of Cambrian was a scheme hatched and executed by Sameer, Praveen, and Weber: (1) the company was established the day after the Preliminary Injunction was entered; (2) Weber appeared to be leading the company in name only; (3) the lack of any type of documentation of the $60,000-$80,000 loan that Praveen gave Weber for Cambrian's startup costs; (4) Weber's statement in an email that the company was created for the purpose of holding it for Sameer and his family; (5) Weber's testimony that he did legal research, and altered the Sethi Petroleum documents as a result of that research, to ensure that the

---

[4] Praveen argues that the only facts that the SEC is basing its motion for contempt against him on are: (1) that he provided cash to Cambrian to pay the salary and commission of its sales staff; (2) from at least October 2015 through April 2016, he paid Cambrian's office rent; and (3) on April 11, 2016, a Certificate of Amendment was filed with the Texas Secretary of State which altered Cambrian's name and listed Praveen as manager of the company (Dkt. #163 at pp. 10-11). However, as outlined herein, the Court found that there were many facts that, when viewed together, constitute clear and convincing evidence that Praveen actively participated in forming and operating Cambrian for the purposes of evading the Court's Preliminary Injunction.

[5] Weber states that "the Commission elicited no testimony, other than screening job applicants, that he ever acted as an agent of Cambrian Resources. He did not enter into contracts of behalf of Cambrian." (Dkt. #165 at p. 2). It is unclear who "he" is referring to, but the Court assumes that it is referring to Sameer, because one sentence later, Weber states that "evidence was presented of John Weber entering into contracts on behalf of Cambrian and in the terminating of employees." (Dkt. #165 at pp. 2-3).

interest that Cambrian was selling did not fit the legal definition of a security; (6) the credible testimony from multiple Cambrian employees that Sameer ran the company; (7) Cambrian's payroll being paid in cash payments; (8) Cambrian's rent being paid by Praveen; (9) Sameer's substantial involvement in the business; (10) Weber's request for payment for days when he filled in for the office manager; (11) Weber's request for payment for assuming the risk of legal liability as the manager of Cambrian; (12) Weber's withdrawal of all of the Cambrian funds and his leaving the funds, in cash, in Praveen's mailbox; (13) Praveen becoming the manager of the company when Weber was ill; (14) Sameer's wife, Julissa Martinez, becoming the manager of the company; (15) Sameer's utilization of his Fifth Amendment rights when he was called to testify at the hearing;[6] (16) Sameer's statement that he was the "contract CEO" of Cambrian; (17) Sameer's acknowledgment that the Court's Preliminary Injunction prohibited him from talking on the phone to potential investors; (18) Weber's statement that he would have been upset had he known what Sameer told the sales employees to say to potential investors; (19) Praveen personally dropping off the payroll cash in the Cambrian office, where he could see and hear what was occurring; (20) Weber's physical presence on numerous occasions in the Cambrian office where he could hear and see what was occurring; (21) Sameer's extensive training of the sales staff; and (22) Weber's testimony that he and Praveen discussed the parameters of what the company could do. Having determined that there is clear and convincing

---

[6] Sameer's refusal to testify and his repeated assertion of the Fifth Amendment while called as a witness in this matter raises an inference that, had he testified truthfully, his testimony would have established that he in fact controlled Cambrian and that Cambrian is, and has been, involved in the offer, issuance, and sale of securities in violation of the federal securities laws and the Court's Preliminary Injunction. In the Fifth Circuit, courts may draw an adverse inference from a defendant's refusal to testify in a civil case. *See Hinojosa v. Butler*, 547 F.3d 285, 295 (5th Cir. 2008). A court cannot decide an issue against a party solely on the basis of the party's invocation of the Fifth Amendment. *See Gulf Coast Bank & Trust Co. v. Stinson*, No. 2:11-CV- 88-KS-MTP, 2013 WL 30136, at *4, n. 2 (S.D. Miss. Jan. 2, 2013). However, a court can decide an issue by "clear and convincing evidence" if there is any independent evidence in addition to the invocation, including witness testimony. *See id*., at *4.

evidence that the parties' actions violated the Preliminary Injunction if the type of interest that Cambrian was selling was a security.

### Definition of a Security

Sections 2(a)(1) of the Securities Act of 1933 ("Securities Act") and 3(a)(10) of the Securities and Exchange Act of 1934 ("Exchange Act") define "securities" to include "investment contracts." 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10). An investment contract exists where: (1) individuals are led to invest money; (2) in a common enterprise; and (3) with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946). The term "solely" is interpreted in a flexible manner, not in a literal sense. *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981). To determine whether profits are expected to come "solely" from the efforts of others, the Fifth Circuit adopted the Ninth Circuit's test, which defined the critical question as "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 (5th Cir. 1974) (citing *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)).

In evaluating whether an interest is a security, "form should be disregarded for substance," and courts should analyze the "economic reality underlying a transaction, and not [focus] on the name appended thereto." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 848–49 (1975).[7] In *Williamson v. Tucker*, the Fifth Circuit established a test to indicate whether

---

[7] Sameer argues that the joint venture that Cambrian was selling was not a security, because venturers signed the Confidential Private Placement Memorandum, which stated the following:

> They 'possess the requisite business knowledge and expertise to select an appropriate Managing Venturer and effectively exercise the managerial powers and authority conferred on the Venturers in the Joint Venture Agreement.' . . . They 'are not relying on [Cambrian Resources LLC's] managerial efforts for the Venture's success.' . . . They have 'extensive and significant managerial powers' as Joint Venture partners . . . 'Each of the Venturers will be a joint venturer in a joint

investors in a purported general partnership or joint venture expected to depend on the efforts of others, thus satisfying the third *Howey* element.  Under *Williamson*, an investment contract exists if any one of the following three factors is present: (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.  645 F.2d at 423.  These factors are not exhaustive.  *Id.* at 424 n. 15.  Although "[t]he test stated in *Williamson* . . . refers to the investor's experience in "business affairs," without referring to specialized knowledge, the Fifth Circuit has "made clear that the knowledge inquiry must be tied to the nature of the underlying venture."  *Long v. Shultz Cattle Co.*, 881 F.2d 129, 134 n. 3 (5th Cir. 1989) (noting that "any holding to the contrary would be inconsistent with *Howey* itself").  *See also Sec. & Exch. Comm'n v. Arcturus Corp.*, No. 3:13-CV-4861-K, 2016 WL 1109255, at *8 (N.D. Tex. Mar. 21, 2016), *reconsideration denied*, No. 3:13-CV-4861-K, 2016 WL 3654430 (N.D. Tex. July 8, 2016).

Furthermore, the Fifth Circuit has stated that "a strong presumption remains that a general partnership or joint venture interest is not a security."  *Youmans v. Simon*, 791 F.2d 341, 346 (5th Cir. 1986).  The *Youmans* court made it clear that "[a] party seeking to prove the

---

venture, which is a general partnership formed for a specific business purpose. As a Venturer, you will have unlimited joint and several liability for all of the debts, obligations, acts, omissions, risks, and liabilities of the Venture . . .'
(Dkt. #164 at p. 4).  Sameer is essentially arguing that since the venturers signed a document stating that the joint venture had all of the characteristics necessary to ensure that it was not considered a security, it must be treated as a security.  Weber and Praveen also assert this argument (Dkts. #163 at pp. 4-5, #165 at p. 5).  However, given that the Court must look to the substance of the agreement, the Court finds this argument unpersuasive.

contrary must bear a heavy burden of proof." *Id.* (citing *Williamson*, 645 F.2d at 424). Therefore, the Court will examine each of the *Williamson* factors to determine if the SEC has met its heavy burden in establishing that the type of interest that Cambrian sold was actually a security.

**The First Williamson Factor: Venturers' Actual Power**

The first *Williamson* factor the Court considers is whether the agreement between the parties gives the venturer little to no power, such as a limited partner would have. 645 F.2d at 424. A general partnership or joint venture interest usually does not fall within the broad definition of "investment contract." *Williamson*, 645 F.2d at 419–421 (stating that when investors possessed, retained, and had the ability to exercise real power in the joint venture or general partnership, courts uniformly refused to find those joint ventures or general partnerships were securities). However, agreements that are more akin to limited partnerships may be considered a security under the statutory definition. *Youmans v. Simon*, 791 F.2d 341, 346 (5th Cir. 1986). Limited partners have limited liability, are typically unable to dissolve the partnership or bind other partners, and have virtually no power to take an active role in the management of the partnership. *Id.* (explaining that limited partners do not possess the same kind of power normally held by general partners).

Sameer, Praveen, and Weber point to several of the Cambrian venturers' alleged power in support of their argument that the venturers had real power, making the interest that Cambrian sold not a security. According to Sameer, "partners/investors had a right of control to remove the manager, to vote on what projects to invest in, to participate in telephone conferences, to review the books and records, and to decide not to allow their investment to be used on a project to which they did not approve." (Dkt. #164 at p. 2). Sameer also notes that Cambrian planned to

issue Asset Nominations & Terms Sheets ("ANTS") before voting, which would include a layman's description of the potential drilling sites, so that the venturers could exercise their power to vote on which assets to purchase and how to allocate the joint venture's funds (Dkt. #164 at pp. 2-3). This, according to Sameer, would have allowed the venturers to exercise their power in a knowledgeable manner.

The SEC argues that "[p]ursuant to Cambrian's own [joint venture agreement], at the outset of the investment, investors expressly delegated the management of the day-to-day operations of the [joint venture] to Cambrian as the Managing Venturer, which evidences formation of a security rather than a general partnership." (Dkt. #161 at p. 6). The SEC also argues that the joint venturers did not have access to essential information that would have allowed them to meaningfully exercise any managerial powers that they were given (Dkt. #161 at p. 8).[8]

This case is similar to *Arcturus*, in which the joint venturers also had the ability to call meetings, and the voting power to remove the managing venturer and amend the joint venture agreement terms, but exercising those powers required a certain percentage of the joint venture interest. 2016 WL 1109255, at *6. The *Arcturus* court pointed out that "[i]f the venturers did not have any contact information for the other venturers . . . how could the venturers ever satisfy the minimum percentage interest to exercise these powers[?]" *Id.* The *Arcturus* court went on to state that "[a]ny right to vote or call a meeting that required a percentage of the venture interest was absolutely hindered by the inability of the venturers to contact each other." *Id.*

---

[8] Praveen argues that neither Jorman nor any other venturer testified that they attempted to establish control and failed (Dkt. #163 at p. 7). The Court finds that testimony of that nature is not required given that Jorman could not even contact other venturers for the purpose of getting a majority of votes in order to control some aspect of the joint venture.

In the current case, Cambrian forbade one of its investors, Jorman, from learning the identity of other investors even when she had specifically requested the information.[9] Just as in *Arcturus,* the problem caused by Cambrian's failure to provide information about other joint venturers was exacerbated by the fact that the joint venturers "had no connection to or prior relationship with one another, except possibly for receiving 'cold calls' as potential investors from a 'leads list.'" *Id.*[10] Likewise, in *Merchant Capital*, the Eleventh Circuit determined that the "barriers" to investors being able to exercise their powers that were within the partnership agreement were compounded because the investors "were geographically dispersed, with no pre-existing relationships" and there was "a lack of face-to-face contact among the partners." *S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 758 (11th Cir. 2007) (citing *Howey*, 328 U.S. at 299). As the SEC points out, "Cambrian's offer and sales efforts were broad and indiscriminate, using purchased lead lists and targeting thousands of potential investors across the country via unsolicited sales calls" (Dkt. #161 at p. 9). Therefore, the Court finds that Cambrian's failure to share the contact information of venturers, whose only connection was being on a cold call list, constituted a significant barrier for the investors' ability to exercise the powers that they were allegedly given.

Furthermore, the Eleventh Circuit has determined that powers are illusory when the promoter controls how much information is given to investors, and he does "not submit

---

[9] Weber states that venturers were given his phone numbers and that Jorman never asked him for the names and contact information of other venturers (Dkt. #165 at p. 2). The Court does not find that this is relevant information for the purposes of its analysis.

[10] Weber seeks to distinguish the *Arcturus* case from the case at hand by pointing out that "[t]he purported venturers in *Arcturus* were expected to have management control over operators or existing oil and gas wells." (Dkt. #165 at pp. 9-10). Weber points out that "[i]n the Cambrian offering, partners were merely expected to select the projects, not manage them. There is a huge distinction in choosing operators on their background, experience and referrals than it is to expect partners to actually manage operators in the oil fields that were already owned by partnership." (Dkt. #165 at p. 10). However, the Court finds that this does not alter the applicability of the *Arcturus* court's analysis of the ability of investors to exercise their voting powers when they did not know each other's identities and had no prior relationship.

sufficient information for the partners to be able to make meaningful decisions." *Merch. Capital*, 483 F.3d at 758. Sameer, Praveen, and Weber argue that investors had access to information about their investments, which weighs in favor of finding that investors were able to meaningfully exercise their powers. However, the Fifth Circuit has stated that "[a]ccess to information does not necessarily protect an investor from complete dependence on a third party where, as here, that same third party is the sole source of information and advice regarding the underlying venture and the investor does not have the expertise necessary to make the essential management decisions himself." *Long v. Shultz Cattle Co.*, 881 F.2d 129, 135-36 (5th Cir. 1989); *see also Arcturus*, 2016 WL 1109255 at *11; *Merch. Capital*, 483 F.3d at 761.

Sameer, Praveen, and Weber appear to rely on their suggestion to Jorman that she read a book about oil and gas as another source of information. However, Jorman said that she did not understand much of the book that they suggested. Additionally, this does not alter the fact that Cambrian would have been the sole source of information regarding the underlying venture. Therefore, the record establishes that the majority of the venturers' powers were delegated to Cambrian, and any arguable power the venturers still possessed could not be exercised because the necessary information was controlled by Cambrian. Because the first *Williamson* factor proves the venturers' dependence on the efforts of Cambrian, the Court finds the third *Howey* factor is established. *See Williamson*, 645 F.2d at 424. Accordingly, Cambrian's joint venture is an investment contract and, therefore, a security. *See Sec. & Exch. Comm'n v. Arcturus Corp.*, 2016 WL 1109255, at *8.

**The Second Williamson Factor: Venturers' Experience and Knowledge**

Even if the first *Williamson* factor had not been satisfied, the Court could look to the second *Williamson* factor to establish complete dependence. *Id.* Under this factor, the Court

considers whether the venturers were inexperienced and lacked expertise in the oil and gas well business. The Court finds the SEC presented sufficient evidence to establish this second factor.

Courts look to the investor's experience and knowledge in the particular business of the venture at issue, not the investor's general business experience. *Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 135 n. 3 (5th Cir. 1989) (noting that *Williamson* "made clear that the knowledge inquiry must be tied to the nature of the underlying ventures."); *see Howey*, 328 U.S. at 296. The critical inquiry is whether the investors are inexperienced and unknowledgeable in this particular business, making it more likely they would "be relying solely on the efforts of the promoters to obtain their profits." *Merch. Capital*, 483 F.3d at 762; *see also Long*, 881 F.2d at 134 ("[A] plaintiff may establish reliance on others within the meaning of *Howey* if he can demonstrate not simply that he did not exercise the powers he possessed, but that he was incapable of doing so.").

Sameer, Praveen, and Weber argue that the Court should consider the investors' general business experience and knowledge, not just their experience and knowledge of the oil and gas industry. *See* Dkts. #163 at p. 6, #165 at p. 8. However, Fifth Circuit precedent clearly requires the Court to examine the venturers' experience and knowledge of the oil and gas industry, because the joint venture at issue involves oil and gas well drilling. *Long*, 881 F.2s at 135 n. 3 (explaining that *Williamson* "clearly requires that the investors' knowledge and experience be evaluated with reference to the nature of the underlying venture.").[11] Using the correct standard, the SEC provided clear and convincing evidence establishing that these venturers were inexperienced and unknowledgeable about oil and gas well drilling.

---

[11] Sameer argues that "[t]here is no evidence before the Court that a lack of professional experience or training in the oil and gas industry is some kind of disqualification from participating as an active partner in an oil and gas general partnership." (Dkt. #164 at p. 5). The Court finds that it is unnecessary for the SEC to provide this type of evidence, as Sameer is clearly applying an incorrect understanding of the applicable standard.

The evidence establishes that Jorman, while educated and a successful business person, had no expertise in the oil and gas business, or drilling specifically, and she would have had to rely on the information Cambrian provided to make any decision that she had power to decide. *See Long*, 896 F.2d at 87 (5th Cir. 1990) (stating that investors "were business and professional people" but they "possessed neither the knowledge nor the desire to buy, raise, and market cattle on an individual basis."). Sameer, Praveen, and Weber's argument that the Court should only analyze the investors' general business and educational background is contrary to well-established Fifth Circuit case law. *See Long*, 881 F.2d at 135 n. 3. While Sameer, Praveen, and Weber point out that Jorman read a book about oil and gas, Jorman testified that she did not understand it. Jorman also testified that she had not previously invested in oil and gas ventures because she did not know about the industry and drilling. Therefore, the Court finds that at least one investor, Jorman, was unexperienced and unknowledgeable about oil and gas well drilling.

As the Supreme Court has explained, an important factor in determining whether a transaction is an investment contract is "the plan of distribution," meaning whether the interests at issue are "offered and sold to a broad segment of the public." *Reves v. Ernst & Young*, 494 U.S. 56, 68 (1990). When investments are offered to a large number of potential investors, this fact weighs heavily in favor of a finding that the investments are securities. *Id.*

Consistent with these Supreme Court decisions, the *Williamson* court noted that a "scheme which sells investments to inexperienced and unknowledgeable members of the general public cannot escape the reach of the securities laws merely by labeling itself a general partnership." *Williamson*, 645 F.2d at 423. The Second Circuit agreed with "the Fifth Circuit in finding that investors may be so lacking in requisite expertise, so numerous, or so dispersed, that they become utterly dependent on centralized management counteracting a legal right of

control." *United States v. Leonard*, 529 F.3d 83, 88-91 (2d Cir. 2008) (emphasis added). Similarly, the Tenth Circuit held that allegations that a promoter "marketed oil and gas interests nationwide to investors with little, if any, experience in the oil and gas industry by means of over 400 cold calls a day" supported the conclusion that the second *Williamson* factor was satisfied. *SEC v. Shields*, 744 F.3d 633, 647 (10th Cir. 2014); *see also Merch. Capital*, 483 F.3d at 758 (recognizing that geographic dispersal and lack of preexisting relationships and face-to-face contact limited partners' ability to exercise their powers); *Schooler*, 2014 WL 1660651 at *10 (concluding that broad solicitation is a fact to consider under the second *Williamson* factor).

The evidence establishes that Cambrian marketed its joint venture through hundreds of daily unsolicited cold calls to thousands of potential venturers whose information came from a "leads list." The evidence also establishes that the Cambrian joint venture offerings were not limited to potential venturers with experience in, or knowledge of, the oil and gas industry. Praveen seeks to distinguish Cambrian's lead list from the lists used in the cases mentioned above by pointing out that Cambrian's list only included "accredited investors" (Dkt. #163 at p. 8). However, the Court finds this argument unpersuasive, because whether or not an individual is an accredited investor is unrelated to whether or not they are knowledgeable about oil and gas.

The Court agrees with the SEC that "[h]ere, the sheer breadth of defendants' indiscriminate solicitation of investors shows that the second *Williamson* factor is present." According to Lewis's unrebutted testimony, he and the other salesmen each called approximately 150 investors per day, five days a week, which means that Cambrian contacted an estimated 2,000 investors per week. Additionally, Palmer testified that he had worked in the oil and gas industry for thirty years and that investors with actual knowledge of the industry recognized that Cambrian was a bad investment, and declined the opportunity. This indicates that Cambrian

preyed on potential investors who lacked the expertise to adequately evaluate the investment. Considering the circumstances under which Cambrian solicited potential investors, and their lack of knowledge at the time of the investment, it is clear that investors did not have the necessary experience in oil and gas to manage their own investment, even if they had any power to do so, which they demonstrably did not.

The Court finds that the second *Williamson* factor, that the venturers lacked experience in and knowledge about the oil and gas industry, has been established by clear and convincing evidence. Because the second *Williamson* factor proves the venturers' dependence on the efforts of Cambrian, the Court finds the third *Howey* factor is established. *See Williamson*, 645 F.2d at 424. Accordingly, Cambrian's joint venture is an investment contract and, therefore, a security.

**The Third Williamson Factor: Venturers' Dependence on the Unique Abilities of Cambrian**

Even if the first and second factors had not been satisfied, the third *Williamson* factor establishes that the venturers were completely dependent on Cambrian's efforts. Under this third factor, a dependent relationship exists when the investors rely "on the managing partner's unusual experience and ability in running that particular business." *Williamson*, 645 F.2d at 423. As noted in *Williamson*, even a partner knowledgeable in the particular investment "may be left with no meaningful option when there is no reasonable replacement for the investment's manager." *Id.* In such a situation, "a legal right of control would have little value if partners were forced to rely on the manager's unique abilities*." Id.; see also Merch. Capital*, 483 F.3d at 763 ("The third factor provides that, even if the arrangement gives the partners some practical control, the instrument is an investment contract if the investors have no realistic alternative to the manager."). The Court finds the SEC presented evidence establishing this third factor as well.

The SEC argues, and the Court agrees, that "Cambrian's numerous representations to investors also created an expectation that Cambrian would manage and operate the investments in a manner that would return a profit to the investors." (Dkt. #161 at p. 15). In assessing the third *Williamson* factor, a court may consider "the representations and promises made by promoters or others to induce reliance upon their entrepreneurial abilities." *Gordon v. Terry*, 684 F.2d 736, 742 (11th Cir. 1982) (holding that third *Williamson* factor is satisfied where promoter touted his ability to generate substantial profit by buying and reselling undeveloped land because of his expertise and experience in the real estate market); *see also Koch*, 928 F.2d at 1478 (finding that, in determining whether a partnership interest is a security, court may look to, among other things, the promotional materials and oral representations made by the promoters at the time of the investment).

The record demonstrates that investors expected that they would depend on Cambrian to manage their investments. Jorman unequivocally testified that she lacked any knowledge or experience relevant to managing her own oil and gas experience, and that while she and her husband had previously been wary to invest in oil and gas, she was persuaded to invest with Cambrian based on numerous extensive conversations with Rowe concerning Cambrian's successful track record, its strategic partnerships and market niches with companies like Exxon and Chevron, Cambrian's "gauntlet," and its staff of experts and geologists, among other things. Additionally, the Cambrian salesmen testified that they touted Cambrian's expertise as vital to the profitability of the investment. The Court agrees that "it is simply not plausible that investors contemplated being able to replace Cambrian as 'managing venturer' while retaining the same deal." (Dkt. #161 at p. 16).

The SEC also argues that "the commingling of funds from investors in Cambrian's Bank of Texas account, controlled exclusively by Cambrian, establishes that investors and the investment program itself were financially dependent on Cambrian." (Dkt. #161). Other courts have held that investors were granted only illusory control over an investment where the enterprise was run by pooling investors' interests so that an individual investor had no control over the operation as a whole, even if he had some control over a subsidiary portion. *See e.g., Koch*, 928 F.2d at 1478, 1480; *Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918, 924-25 (4th Cir. 1990). In *Merchant Capital*, the Eleventh Circuit concluded that the partners had no realistic alternative to the current manager, as well as no actual power to remove him, because the manager "effectively had permanent control over each partnership's assets." 483 F.3d at 763; s*ee also Arcturus Corp.*, 2016 WL 1109255, at *10 (stating that "[t]he venturers had no access to their funds because the money was held in an account controlled exclusively by [the manager], not the Joint Venture.").

This is similar to the case at hand. The evidence demonstrates that Weber took the investments, placed them into an account Cambrian exclusively controlled, and used the funds to pay for the costs associated with running Cambrian's office. Additionally, when Jorman asked for her money back, she never received it, clearly indicating that Cambrian venturers had no access to their funds. Furthermore, what remained of the assets were converted into cash, and left in Praveen's mailbox. Thus, even if Cambrian was replaced, it does not appear that the assets would be accessible to the partners. This is especially true given that it is not clear how much of the assets remained when they were placed in Praveen's mailbox.[12] The SEC has

---

[12] At the hearing, Weber testified that when he withdrew the funds from the Cambrian account, there was over $49,000 remaining, and that he placed that amount of money, in cash, in Praveen's mailbox when he was not home. While Praveen's counsel initially made it appear that Praveen might deny that he received the cash, when the Court called Praveen back to the stand and questioned him about the matter, it became clear that Praveen did receive the

submitted evidence that, just as in *Arcturus*, the venturers in the current case lacked any control over their money, which created a complete dependency on Cambrian.[13]

Sameer, Praveen, and Weber also argue that "the gauntlet" was not proprietary, and nothing prohibited venturers from going out and hiring experts themselves. However, as previously discussed, the investors lacked the knowledge and skill necessary to meaningfully participate and utilize their alleged power, in addition to Cambrian being the source of the information that they would have based any decision on.[14]

The Court finds the third *Williamson* factor, whether the venturers were dependent on Cambrian as manager, has been established. Because the third *Williamson* factor proves the venturers' dependence on the efforts of Cambrian, the Court finds the third *Howey* factor is established. *See Williamson*, 645 F.2d at 424. Accordingly, the Cambrian joint venture is an investment contract and, therefore, a security. Furthermore, the Court finds that the Cambrian joint venture at issue is an investment contract because each of the three *Williamson* factors is established. *See Merch. Capital*, 483 F.3d at 756 ("the presence of one of the three *Williamson* factors renders even a general partnership interest an investment contract.").

The Court agrees with the SEC that its findings are also supported by Weber's own testimony that he would have been "incandescent" if he had heard what the salesmen were telling investors under Sameer's supervision (Dkt. #161 at p. 13). This testimony demonstrates

---

cash. However, Praveen testified that there was only $44,000 in his mailbox. While it remains unclear how much money was placed in Praveen's mailbox, it is clear that the remaining funds were placed in Praveen's mailbox and that he received them.

[13] Praveen argues that the Joint Venture Confidential Private Placement Memorandum allowed the managing venture to spend part of the capital raised on day-to-day operations "during the period of this offering regardless of the total amount of capital raised by the Managing Venture for this partnership" (Dkt. #163 at p. 8) (citation omitted). However, whether or not the venturers consented to their funds being spent on overhead costs does not change that the venturers lost control of their investment in the current case.

[14] Praveen also argues that the fact that venturers were passive is not enough to satisfy the third *Williamson* factor (Dkt. #163 at p. 10). However, as is clear in the above analysis, the Court is not basing its finding that the SEC has established the third *Williamson* factor on the *passivity* of venturers; the Court is basing it on the *inability* of the venturers.

that "whatever effort Weber may have undertaken in the SMU law library to avoid papering Cambrian like a security, he has no basis to contest that Cambrian's salesmen were selling something with all the marks of a security." (Dkt. #161 at p. 13). Thus, Weber's, Praveen's,[15] and Sameer's attempt to avoid violating the Court's order by creating an illusory joint venture, has failed. Therefore, the Court finds that Sameer, Praveen, and Weber have violated the Preliminary Injunction and are in contempt.

## CONCLUSION

The Court has already cautioned Sameer against attempting to violate its orders, and has directly told Sameer that it would "not look favorably on any continued attempts to circumvent either the spirit or the letter of its orders." (Dkt. #50). The actions taken by Sameer, Praveen, and Weber clearly violated both the spirit and the letter of the Court's order. This is supported by clear and convincing evidence that the parties deliberately attempted to disguise the nature of their involvement with Cambrian and the illusory nature of the interests that Cambrian was selling. Likewise, even though Sameer repeatedly assured Weber that he would not get on the phones with investors, there is clear and convincing evidence that he sold directly to potential investors. Sameer, Praveen, and Weber clearly acted with the Court's Preliminary Injunction in mind.

The Court finds that the SEC established by clear and convincing evidence that Sameer Sethi, Praveen Sethi, and John Weber each were aware of the Preliminary Injunction and nevertheless violated the terms of the Preliminary Injunction by directly or indirectly engaging in

---

[15] Praveen argues that the Court does not have jurisdiction over him because he has an independent interest in Cambrian because he is seeking to obtain repayment of loans (Dkt. #163 at p. 12) (citing *Parker v. Ryan*, 960 F.2d 543, 546 (5th Cir. 1992) ("[I]if a nonparty asserts an independent interest in the subject property and is not merely acting on behalf of the defendant, then rule 65(d) does not authorize jurisdiction over the party."))). However, the Court has found by clear and convincing evidence that Praveen made the loans *in order to help Sameer evade the Preliminary Injunction*. Therefore, the Court finds that Praveen was merely acting on behalf of Sameer when he gave the loan to Cambrian, which was controlled by Sameer.

the offer, issuance, or sale of securities through Cambrian Resources LLC. Therefore, the Court finds that Sameer Sethi, Praveen Sethi, and John Weber each violated the Court's May 26, 2015 Order, and hereby enters a Contempt Order against each contemnor.

It is therefore **ORDERED** that Sameer Sethi, Praveen Sethi, and John Weber shall cease and desist from the offer and sale of any securities.

It is further **ORDERED** that Sameer Sethi, Praveen Sethi, and John Weber shall cease and desist Cambrian Resources LLC's operations, providing sworn declarations describing the steps undertaken to do so.

It is further **ORDERED** that Sameer Sethi, Praveen Sethi, and John Weber shall provide a sworn accounting for all Cambrian assets, including all moneys in and out, within fourteen (14) days of the entry of this Order.

It is further **ORDERED** that Sameer Sethi, Praveen Sethi, and John Weber shall themselves return, jointly and severally, $62,500 to Beverlyn Jorman and $15,000 to investor Clark, and confirm in writing that there were no other investors of Cambrian Resources LLC or related entity, within fourteen (14) days of the entry of this Order.

It is further **ORDERED** that Sameer Sethi, Praveen Sethi, and John Weber shall pay the Commission's costs incurred in bringing this Motion, upon the Court's approval of the Commission's bill of costs.

It is further **ORDERED** that if Sameer Sethi, Praveen Sethi, and John Weber fail to comply within fourteen (14) days of the entry of this Order, the SEC shall notify the Court. At that time, the Court will consider whether jail time or a fine of $500 will be assessed against Sameer Sethi, Praveen Sethi, and John Weber, individually, for every day that a sworn

accounting is not provided and a return of the investors' money is not executed, past the deadline.

**SIGNED this 9th day of August, 2016.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE