**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Case No.: 4:15-CV-00338-ALM** |
| **SETHI PETROLEUM, LLC and** | § | |
| **SAMEER P. SETHI,** | § | |
| | § | |
| **Defendants** | § | |
| | § | |
| _____ | § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AS TO SAMEER SETHI AND BRIEF IN SUPPORT**

DATED: September 14, 2016                    Respectfully submitted,


Matthew J. Gulde
Illinois Bar No. 6272325
Jessica B. Magee
Texas Bar No. 24037757
SECURITIES AND EXCHANGE COMMISSION
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX  76102-6882
(817) 978-1410 (MJG)
(817) 978-4927 (fax)
guldem@sec.gov

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION

## TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................................i-ii

TABLE OF AUTHORITIES ....................................................................................iii-vi

I.      INTRODUCTION AND SUMMARY OF THE CASE..................................1

II.     STATEMENTS OF ISSUES TO BE DECIDED .........................................2

III.    SUMMARY JUDGMENT STANDARD .......................................................3

IV.     STATEMENT OF UNDISPUTED MATERIAL FACTS .............................3

        A.      Structure of Sameer's NDDF Investment Program ..................................4

        B.      Sethi and Sethi Petroleum used fraudulent misstatements and omissions to solicit
                funds for the NDDF ...................................................................................6

                1.      Misstatements about Defendants' history and experience..........................6

                2.      False claims of partnership with major companies.....................................8

                3.      False claims about size of NDDF's interest in wells .................................8

                4.      False and unfounded representations about NDDF returns .......................9

                5.      Sethi's personal instructions to "boiler room" sales staff to mislead
                        potential investors ...................................................................................10

        C.      Misused investor funds .......................................................................11

        D.      This Litigation......................................................................................12

V.      ARGUMENT AND AUTHORITIES.............................................................14

        A.      The Court Should Draw a Negative Inference Against Sameer Based on His
                Continued Refusal to Testify ................................................................14

        B.      The Court Should Find That the Interests in Supposed Joint Venture Units Sameer
                Offered and Sold Were Investment Contract Securities .......................................15

                1.      The First *Williamson* Factor is Present as a Matter of Law Because
                        Investors Had No Real Power Over Their Investment ..............................16

2.       The Second *Williamson* Factor is Present as a Matter of Law, Because Investors Were Inexperienced in Oil and Gas Business ..........................19

3.   The Third *Williamson* Factor is Present as a Matter of Law ..........................21

C.     The Commission is Entitled to Summary Judgment on Its Fraud Claims .............22

1.   Elements of Securities Fraud ..........................................................22

2.   Sameer Violated the Anti-Fraud Provisions of the Federal Securities Laws .........................................................................23

a.       Sameer used the Mails and Instrumentalities of Interstate Commerce ....................................................................24

b.       Sameer Engaged in the Offer, Purchase and Sale of Securities.....24

c.       Sameer Made Material Misprestations To Investors ................24

d.       Sameer Conducted a Fraudulent Scheme ......................................26

e.       Sameer Acted with a High Degree of *Scienter* .............................27

f.       Sameer is Liable as a Control Person for Sethi Petroleum's Violations of the Antifraud Provisions of the Securities Laws......28

g.       Sameer also Violated Securities Laws Through the Actions of Others .........................................................................29

VI.    **CONCLUSION**……… ..............................................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aaron v. SEC*,
446 U.S. 680 (1980).................................................................................23, 24, 27

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972).................................................................................26

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................3

*Anderson v. McGrath*,
2013 WL 1249154 (D. Ariz. Mar. 26, 2013).............................................29

*Bailey v. J.W.K. Properties, Inc.*,
904 F.2d 918 (4th Cir. 1990) ....................................................................22

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................25

*Broad v. Rockwell International Corp.*,
642 F.2d 929 (5th Cir. 1981) ....................................................................27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).................................................................................3

*In re Enron Corp. Sec., Derivative & ERISA Litigation*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ......................................................28

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976).................................................................................27

*Forsyth v. Barr*,
19 F.3d 1527 (5th Cir. 1994) ....................................................................3

*G.A. Thompson & Co., Inc. v. Partridge*,
636 F.2d 945 (5th Cir. 1981) ....................................................................28

*Grippo v. Perazzo*,
357 F.3d 1218 (11th Cir. 2004) ................................................................27

*Hinojosa v. Butler*,
547 F.3d 285 (5th Cir. 2008) ....................................................................14

*Koch v. Hankins*,
    928 F.2d 1471 (9th Cir. 1991) ...........................................................................17, 22

*Koehler v. Pulvers*,
    614 F. Supp. 829 (S.D. Cal. 1985)..............................................................................25

*Long v. Shultz Cattle Co.*,
    881 F.2d 129 (5th Cir. 1989) ...............................................................................16, 18

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982)....................................................................................................19

*Maritan v. Birmingham Properties*,
    875 F.2d 1451 (10th Cir. 1989) ..................................................................................16

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990)......................................................................................................19

*SEC v. C.M. Joiner*,
    320 U.S. 344 (1943)...............................................................................................17, 19

*SEC v. Continental Wireless Cable Television, Inc.*,
    110 F.3d 69 (9th Cir. 1997) .........................................................................................18

*SEC v. Daifotis*,
    874 F. Supp. 2d 870 (N.D. Cal. 2012) ........................................................................29

*SEC v. Gann*,
    565 F.3d 932 (5th Cir. 2009) ......................................................................................23

*SEC v. Glenn W. Turner Enterprises, Inc.*,
    474 F.2d 476 (9th Cir. 1973) ......................................................................................15

*SEC v. Hopper*,
    2006 WL 778640 (S.D. Tex. Mar. 24 2006)...............................................................23

*SEC v. Merchant Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) ...............................................................18, 20, 21, 22

*SEC v. Rana Research, Inc.*,
    8 F.3d 1358 (9th Cir. 1993) ........................................................................................23

*SEC v. Schooler*,
    2014 WL 1660651 (S.D. Cal. Apr. 25, 2014)...................................................16, 19, 20

*SEC v. Seghers,*
    298 F. Appx. 319 (5th Cir. 2008) ..............................................................23

*SEC v. Shields,*
    744 F.3d 633 (10th Cir. 2014) ..............................................16, 17, 18, 20

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946) ........................................................................15, 16

*SEC v. Zandford,*
    535 U.S. 813 (2002) ...................................................................25, 26, 27

*Steadman v. SEC,*
    603 F.2d 1126 (5th Cir 1979) ...................................................................24

*TSC Industrial, Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) ..................................................................................25

*United Housing Foundation, Inc. v. Forman,*
    421 U.S. 837 (1975) ..................................................................................16

*United States v. Leonard,*
    529 F.3d 83 (2d Cir. 2008) ..............................................................18, 20

*Williamson v. Tucker,*
    645 F.2d 404 (5th Cir. 1981) ...............................................15, 16, 19, 21

## FEDERAL STATUTES

Section 2(a)(1) of the Securities Act of 1933,
    [15 U.S.C. § 77b(a)(1)] ............................................................................15

Section 17(a) of the Securities Act of 1933,
    [15 U.S.C. § 77q(a)] .....................................................................22, 23, 24

Section 17(a)(1) of the Securities Act of 1933,
    [15 U.S.C. § 77q(a)(1)] ........................................................................24, 26

Section 17(a)(2) of the Securities Act of 1933,
    [15 U.S.C. § 77q(a)(2)] ........................................................................24, 27

Section 17(a)(3) of the Securities Act of 1933,
    [15 U.S.C. § 77q(a)(3)] ...................................................................24, 26, 27

Section 3(a)(10) of the Exchange Act of 1934,
   [15 U.S.C. § 78c(a)(10)] ............................................................15

Section 10(b) of the Exchange Act of 1934,
   [15 U.S.C. § 78j] .....................................................................24

Section 10(b) of the Exchange Act of 1934,
   [15 U.S.C. § 78j(b)] .................................................22, 23, 24, 25, 26

Section 20(a) of the Exchange Act of 1934,
   [15 U.S.C. § 78t(a)]..................................................................23

Section 20(b) of the Exchange Act of 1934,
   [15 U.S.C. § 78t(b)] .................................................................23

Rule 10b-5 of the Exchange Act of 1934,
   [17 C.F.R. § 240.10b-5] .........................................22, 23, 24, 25

Rule 10b-5(a) of the Exchange Act of 1934,
   [17 C.F.R. § 240.10b-5(a)].........................................................26

Rule 10b-5(c) of the Exchange Act of 1934,
   [17 C.F.R. § 240.10b-5(c)].........................................................26

Pursuant to FED. R. CIV. P. 56, Plaintiff Securities and Exchange Commission ("Plaintiff" or "Commission") files this Motion for Summary Judgment, and in support thereof, respectfully shows as follows:

## I.
## INTRODUCTION AND SUMMARY OF THE CASE

Between at least January 2014 and the filing of this action on May 14, 2015 [Dkt. 1], Sameer P. Sethi ("Sameer") and his company, Sethi Petroleum, LLC ("Sethi Petroleum"), carried on a fraudulent scheme and made materially false and misleading statements and omissions to potential and actual investors in order to offer and sell securities in the Sethi-North Dakota Drilling Fund-LVIII Joint Venture ("NDDF"), an oil and gas investment program.

Using a private placement memorandum ("PPM") and Executive Summary which were full of fraudulent and misleading statements and selling through a cold-call boiler room in which Sameer personally instructed sales staff to lie to potential investors, Defendants raised more than $4 million from approximately 90 investors located in 28 states.  In NDDF offering documents, Sethi Petroleum's website, and other communications with investors, Defendants, among other things:

- falsely represented that 70% of their investment funds would be used to acquire, drill, and complete 20 oil and gas wells, of which NDDF would own approximately 62.5% "net working interest;"

- falsely represented that investors could expect annual returns as high as 30-60% or more;

- falsely represented to investors that Sethi Petroleum was partnered with "major oil and gas companies" such as Continental Resources, Exxon Mobil, Hess Corporation, and ConocoPhillips;

- falsely represented Sethi's business experience; and

- inadequately disclosed Sethi's history of criminal incarceration and state regulatory disciplinary actions against Sethi and Sethi Petroleum.

Instead of using NDDF investors' funds to acquire interests in oil and gas wells in the expected proportions, Sameer, personally and through Sethi Petroleum, used the vast majority of investors' funds in a manner inconsistent with their representations to investors.

Sameer's actions violated the antifraud provisions of the federal securities laws including Section 17(a) of the Securities Act of 1933 ("Securities Act"), Sections, 10(b), 20(a), and 20(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.  Because the evidence amply establishes Sameer's fraud, and because there exists no material fact in dispute concerning his violations, the Commission is entitled to summary judgment on all claims.

## II.
## STATEMENT OF ISSUES TO BE DECIDED

Pursuant to L.R. 56(a), Plaintiff submits this summary of each claim or defense as to which summary judgment is sought against Sameer.  The Commission asks the Court to find that there is no genuine issue of material fact and that the Commission is entitled to judgment as a matter of law as to the following:

1. Sameer Sethi's repeated refusal to testify when called as a witness in this action warrants a negative inference that, had he testified truthfully, his testimony would have established his violations of the federal securities laws as alleged in the Complaint. [Dkt. 1].

2. The "joint venture units" Defendants offered and sold to members of the general public nationwide were investment contracts, and therefore, securities.

3. Sameer Sethi committed securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act, both as a control person of Sethi Petroleum and acting through other persons or entities in violation of Sections 20(a) and (b) of the Exchange Act.

### III.
### SUMMARY JUDGMENT STANDARD

Summary judgment, "upon all or any part of [a] claim," is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The SEC, as the movant, bears the initial burden of identifying the evidence that demonstrates the absence of any material fact.  *See Celotex*, 477 U.S. at 323.  Once that burden is met, the defendants cannot rest on mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative to defeat the motion.  *Celotex Corp.,* 477 U.S. at 324*; Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994) ("Needless to say, unsubstantiated assertions are not competent summary judgment evidence.").  Instead, they must submit significant probative *evidence* to show that material, triable issues of fact remain.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) .  "The mere scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  *Liberty Lobby*, 477 U.S. at 252.  In short, the Court must enter summary judgment if, under the governing law, there is only one reasonable conclusion. *Anderson,* 477 U.S. at 250.

### IV.
### STATEMENT OF UNDISPUTED MATERIAL FACTS

In accordance with L.R. CV-56(a), the Commission contends that the following facts are undisputed:

Sameer is a 34 year old man living in Murphy, Texas.  In 2004, he was convicted of aggravated assault in 2004 in Collin County and sentenced to four years in prison.  [App. at 3, 106, 114].[1]  Following an unsuccessful appeal, he served two-and-a-half years in prison between June 2006 and January 2009.  [App. at 3, 111, 114].  Sethi Petroleum is the successor in interest

---

[1] This Motion for Summary Judgment and Brief in Support incorporates, without refiling, the Appendix filed in support of the Commission's Motion for Temporary Restraining Order (Dkt. 4-2).  For clarity, additional Appendix materials, attached to this Motion, will begin at page App. 722, supplementing the TRO's 721-page Appendix.

to a company that Sethi started in 2003, Sameer P. Financial Group, Inc.  [App. at 2, 89-104].

Sameer and his father, contemnor Praveen Sethi, operated this company through several name

changes until it reached its current incarnation as Sethi Petroleum, LLC in July 2012.  *Id.*

Sameer was the sole managing member and president of Sethi Petroleum, and managed and

otherwise directed the company's business from at least November 2011 through this Court's

appointment of a Receiver over it.  [App. at 3, 18, 99].

On May 21, 2006, the Pennsylvania Securities Commission ordered a Sethi Petroleum

predecessor, Sethi Oil & Gas, Inc. ("Sethi O&G"), and contemnor Praveen Sethi ("Praveen") to

cease and desist from offering and selling unregistered securities in that state, concluding that

Sethi O&G and Praveen Sethi solicited an unaccredited investor to purchase unregistered

securities that were marketed as joint venture interests.  [App. at 3, 118].

In 2009, Sameer and Sethi O&G agreed to cease and desist from selling unregistered

securities in the State of Colorado after the Colorado Securities Commission sued them.  [App. at

4, 137].  In 2010, Sameer admitted that he and his company had violated Colorado's cease and

desist order after which a state district court permanently enjoined Sameer and Sethi Oil & Gas,

Inc. from engaging in unregistered and fraudulent offerings in Colorado.  [App. at 4, 140-152].

## A.       Structure of Sameer's NDDF Investment Program

At least as early as January 2014, Sameer and his company Sethi Petroleum began

offering investors positions in NDDF, a purported "joint venture" that offered investors returns

from two sources: oil-and-gas revenues and tax benefits from oil-and-gas exploration and

production activities.  [App. at 20].[2]   Among materials promoting the investment, Defendants

created a private placement memorandum ("PPM") and an Executive Summary for the NDDF

---

[2] On March 17, 2014, Sameer filed a Form D with the Commission, claiming that Sethi Petroleum's NDDF offering
was an exempt offering of securities under Rule 506(c) of Regulation D.  [App. at 5, 188-92].

program (collectively, the "Offering Documents") and provided them to potential investors in the program using the United States mails.[3]  [App. at 20, 197].

In the Offering Documents, Sethi Petroleum claimed that it intended to raise $10 million to exploit its exclusive rights to purchase mineral interests and to participate in oil and gas development on 200,000 acres in the Williston Basin of North Dakota, South Dakota, and Montana.  [App. at 6, 22, 200].  The PPM stated that 70% of investor funds would be used for the acquisition, drilling, and completion of the wells and that the remaining 30% of funds would be spent on legal, engineering, syndication, administration, and management expenses.  [App. at 41].

Sethi Petroleum marketed NDDF interests through a 20-person sales staff using pitch scripts, purchased lead lists, and cold calls.  [App. at 714].  The company compensated its sales staff with bi-weekly draws and an additional 12-15% commission on sales.  *Id.*  Sameer Sethi regularly visited Sethi Petroleum's boiler room to provide sales tips and directions on statements to make to potential investors.  *Id.*

NDDF investors were required to sign NDDF's joint venture agreement ("JVA") appointing Sethi Petroleum as managing venturer.  [App. at 65-88].  The JVA purported to give investors control of NDDF's affairs and operations, but empowered Sethi Petroleum – led by Sameer Sethi – to manage the venture's day-to-day operations.  *Id.*  Among the powers granted to Sethi Petroleum were "sole and absolute discretion" to distribute NDDF profits to investors; authority to execute oil and gas operating agreements; power to take and hold title to NDDF's property; and authority to hire all professionals on NDDF's behalf, including engineers, geologists and appraisers.  *Id.*  According to the JVA, certain significant actions – such as

---

[3] As established during the August 1, 2016 contempt hearing, the NDDF PPM was substantially similar to the PPM Sameer later caused to be distributed by Cambrian Resources, LLC. [See, *e.g.*, Dkt. 161, Plaintiff's Closing Brief].

acquiring oil and gas interests or removing the managing venturer – required the majority vote of investors.  *Id.*

In reality, Sethi and Sethi Petroleum did not allow NDDF investors to consult or vote on any matter in connection with NDDF.  [App. at 699].  NDDF investors did not receive ballots and were not provided access to Sethi Petroleum's books and records or the books and records of NDDF.  *Id.*  Further, NDDF investors were never provided a list of other NDDF investors and relied solely on Sethi Petroleum to manage their investment in NDDF.  *Id.*  After his appointment, the Sethi Petroleum receiver, Marcus Helt, reviewed thousands of documents in the receivership estate and found no evidence of Sethi Petroleum ever organizing an investor vote or soliciting input of any kind from investors.  [Declaration of Marcus Helt ("Helt Decl."), App. 000724].

**B.     Sethi and Sethi Petroleum used fraudulent misstatements and omissions to solicit funds for the NDDF**

In the Offering Documents and elsewhere, Sameer and Sethi Petroleum misrepresented their history and experience, the scope of the NDDF investment, the identities of Sethi Petroleum's partners, the use of investors' funds, and historical and expected returns, among other things.  Indeed, after conducting his investigation, the Sethi Petroleum receiver concluded that "the entire Sethi Enterprise was a sham," based on commingling of funds, lack of corporate formalities, the company's undisclosed insolvency, and misleading use of funds.  [App. at 722-24].

### 1.     Misstatements about Defendants' history and experience

The Offering Documents misrepresented and omitted the criminal and regulatory history described above.  First, the PPM claims, "Sameer Sethi has managed the Company since it was founded." [App. at 42].  Since the company was founded in 2003, this claim misrepresented the

fact that Sameer was in prison for aggravated assault between July 2006 and January 2009 and unavailable to manage his company.  [App. at 3, 106, 111, 114].  The Offering Documents disclosed Sethi's criminal history obliquely on the final page of the 40-page PPM, saying "[a] certain control person of the Managing Venturer was previously indicted for aggravated assault more than twelve years ago."  The Offering Documents disclosed neither Sethi's conviction nor his years behind bars during which he did not manage Sethi Petroleum's day-to-day operations. [App. at 13, 64].

The Offering documents took a similarly misleading tack in disclosing Sethi Petroleum's regulatory history.  Again buried in the final pages of the PPM, the Defendants stated, "[a] certain control person of the Managing Venturer has previously been alleged of violating the registration requirements in connection with marketing investments in oil and gas ventures in the states of Colorado and Pennsylvania.  These matters were settled with minimal litigation."  [App. at 14, 63-64].  The PPM did not disclose the cease-and-desist orders; Colorado's separate civil action, in which Sethi O&G and Sameer were charged with securities fraud and ultimately admitted to violating Colorado's cease-and-desist order; that accusations were leveled by state securities regulators and not private parties; that state regulators targeted Sethi O&G; or that Defendants agreed to resolve all allegations through settlements.  *Id.,* [App. at 137, 140-152].

Sameer and his company also claimed that he "started out in banking and later became a registered representative of FINRA."  In fact, Sameer was never registered with FINRA.  [App. at 42].  While he worked for a broker-dealer from January 2000 to October 2001, he was never a registered representative.  [App. at 12-13, 493-496].

### 2.      False claims of partnership with major companies

Sameer's Offering Documents claimed that NDDF's wells would be "operated by publicly traded and/or major oil and gas companies" such as Continental Resources, Exxon Mobil, Hess Corporation, and ConocoPhillips.  [App. at 6, 22, 205].  They repeated this particular claim in many different venues, including interviews, Sethi Petroleum's cold-call script for selling NDDF to investors, Sethi Petroleum's website, a craigslist.org posting by the company, and Sameer's LinkedIn page.  [App. at 10, 11, 469, 479-489].   In reality, in July 2014, Sethi Petroleum began negotiating the purchase of working interests with Irish Oil & Gas, Inc. ("Irish Oil & Gas"), a private oil and gas company located in North Dakota.  [App. at 265].

### 3.      False claims about size of NDDF's interest in wells

The PPM stated that NDDF investors' funds would be used to purchase approximately 62.5% net working interest in at least 20 wells.  [*e.g.,* App. at 22].  In reality, in August 2014, the NDDF acquired from Irish Oil & Gas in exchange for $900,000, fractional working interests ranging from 0.15% to 2.5% in only eight or nine wells.  [App. at 269-309, App. 723].  The operators of the acquired wells were Crescent Point Energy U.S. Corp., Oxy USA Inc., and Slawson Exploration Co., not the "major oil and gas companies" they had touted.  *Id.*

Of those wells, only six produced oil or gas.  [App. at 8-9].  The well drilling permits for two of the wells were voluntarily cancelled by their operators in December 2014 and January 2015, respectively.  [App. at 313, 355].  The remaining wells produced a combined total of 9,147 barrels of oil in January 2015; 13,995 barrels of oil in February 2015; and 12,357 barrels of oil in March 2015, far less than the million-barrels-per-month Defendants claimed.  [App. at 8-9, 384-394]; *infra* Section E.  Since appointment of the receiver in this case, *all* of the wells associated with Sethi Petroleum (not just NDDF) produced total proceeds of $2,489.85.  [App. at 723].

On September 4, 2014, Sethi Petroleum filed a lawsuit in NDDF's name against Irish Oil & Gas to rescind the purchase of working interests in the wells – NDDF's only oil and gas asset. [App. at 9, 396].  In the Amended Complaint, Sethi Petroleum claims NDDF's wells are only producing four barrels of oil a day and it will take ten to twelve years for the NDDF to recoup the $900,000 it paid for the working interests, not to mention the more than $4 million Defendants took from investors.  [App. at 459].  Defendants have never revised their sanguine predictions, or disclosed the existence of this lawsuit to NDDF investors, or that more than $40,000 their investment funds have been used to pay legal fees to pursue the litigation.  [App. at 10].

### 4.     False and unfounded representations about NDDF returns

When soliciting investors, even after suing Irish Oil, Sameer and Sethi Petroleum claimed that investors could expect average returns of at least 30% per year.  [App. at 6, 716].  Sameer personally directed his sales staff to tell prospective investors they could expect annual investment returns ranging from 30% to 60%.  [App. at 716].  The Offering Documents contained variations of this claim.  For instance, a table in the Executive Summary presents scenarios resulting in annual returns ranging from 32% to 254%, assuming each NDDF well produces 7,250 to 58,000 a barrels of oil a month.  [App. at 217].  Defendants also utilized a FAQ document, shared with at least one investor in February 2014, indicating that NDDF investors could recoup their entire investment and realize a 100% profit within a year.  [App. at 491, 705].  Also, Sethi Petroleum solicited investors to participate in the NDDF offering through a January 2015 Craigslist posting that claimed existing investors had already realized average returns of 30% to 50% per year – a patent falsity.  [App. at 12, 481].

These representations were false and, even if viewed as projections, were unfounded. Sethi Petroleum did not acquire interests in any wells for NDDF until August 2014, months after launching the program and first raising investor funds. [App. at 8, 269-309]. Even then, Sethi Petroleum acquired only tiny fractional interests in just eight or nine wells, and the monthly production rates of five of the six producing wells were much lower than the figures Sethi Petroleum used in its projections and statements of historical production. [App. at 8-9, 310-311, 384-394, 716, 723]. At these low participation levels and monthly production rates, NDDF wells (1) had not produced what Sameer said they had produced; and (2) were incapable of generating sufficient production to provide the returns Sethi Petroleum promised to investors. This was borne out by investors' actual experience and the receiver's investigation. Investors interviewed in connection with the Commission's underlying investigation have each received only a single distribution, in amounts ranging from approximately $30 to $230. [App. at 12, 697]. The receiver found that Sethi "spent virtually the entire $13 million" raised across all of his projects, and that the receivership estate is left with mineral interests that, to date, the receiver has not been able to sell. [App. at 723-24].

> **5.** **Sethi's personal instructions to "boiler room" sales staff to mislead potential investors**

Sameer regularly visited Sethi Petroleum's sales staff to provide sales tips. [App. at 716]. By late 2014, Sethi was explicitly directing his salespeople to tell prospective investors that (1) NDDF had already purchased interests in 12 profitable wells, which were producing a total of one million barrels of oil per month; (2) new investors would immediately begin receiving revenue checks from the wells; (3) the remaining eight wells would be drilled by the end of 2014; and (4) investors could expect 30% to 60% returns on investment per year. [App. at 716]. As Sameer knew at the time, each of these claims was false. Indeed, by that time, and

unbeknownst to investors, Defendants had already caused NDDF to sue for rescission of the purchase of its only working interests.  [App. at 9-10, 395-468].

## C.    Misused investor funds

Only $900,000 of NDDF investors' funds went to the purchase of oil and gas interests. [App. at 641, 675, 694].  Defendants used the majority of the NDDF investors' remaining funds on items not reasonably related to the NDDF project, including payments to insiders, related entities, and salesmen; cash withdrawals; and home theater and liquor expenses; among other things.[4]  [App. at 642, 677-694].  This use of funds stands in stark contrast to the representations of the PPM, which stated that 70% of investor funds will be used for the acquisition, drilling, and completion of the wells.  [App. at 40-41].  In reality, Defendants used less than 24% of investors' funds for those purposes, siphoning larger amounts to themselves, their salesmen, and Sethi Petroleum's parent company.  [App. at 643, 696].  This jibes with the receiver's findings across all of Sethi's offerings, which show that Sethi spent only about $3 million of the $13 million he raised on actually purchasing mineral assets.  [App. at 723].

On January 9, 2014, Sameer opened NDDF's bank account at Bank of America ("BofA").  [App. at 639-640].  Sameer and Praveen were authorized signers on the account. [App. at 640, 662-670].  From January 28, 2014 through March 9, 2015, Sameer used the NDDF account to raise over $4 million from 90 investors in 28 states across the country – including, but not limited to, Texas, New York, California and Florida.  [App. at 641].  BofA records indicate that NDDF received funds from investors in the form of checks and wire transfers.  *Id.*  From February 6, 2014 through March 31, 2015, Sameer and Praveen moved $3.15 million of investor funds to the Sethi Petroleum's general account in more than 80 account transfers.  *Id.*

---

[4] Though Defendants' commingling of funds, including unrelated funds being added to the NDDF account, makes the process of tracking NDDF investors' funds difficult, it is clear that the representations in the PPM do not come close to describing how Defendants actually used investors' money.  [App. at 643].

Defendants commingled NDDF investors' money with Sethi Petroleum funds and other investors' funds.  [App. at 641].  By commingling investors' funds, Defendants acted without regard for the PPM, which stated that "there will be no commingling of funds between the Venture and Sethi Petroleum or any Affiliate thereof other than as may temporarily occur during the payment of bills and/or distributions by Sethi Petroleum on behalf of the Venture."  [App. at 641-42].

**D.      This Litigation**

On May 14, 2015, the Court granted the Commission's emergency *ex parte* request and issued a temporary restraining order, asset freeze, and other injunctive relief (the "TRO") against Sethi Petroleum, LLC ("Sethi Petroleum") and Sameer (Dkt. #11).  The Court also appointed a receiver over Sethi Petroleum (Dkt. #12).  On May 26, 2015, the Court issued an Agreed Order Granting Preliminary Injunction, Asset Freeze, and Other Relief (the "Preliminary Injunction") (Dkt. #23).

On June 22, 2016, the Commission filed an Emergency Motion for Show Cause Hearing to Hold [Sameer] and Others in Contempt. [Dkt. 138] In that Motion, the Commission requested that the Court order Sameer, Praveen, and John Weber ("Weber") to show cause why they were not in contempt of the Court's orders in connection with their renewed efforts to offer and sell securities – oil and gas interests – through Cambrian Resources. [Dkt. 139].  After receiving the parties' briefing and an extensive hearing at which evidence was presented by all parties in interest, the Court held Sameer, Praveen, and Weber in contempt.  [Dkt. 169]  When called to testify at the August 1, 2016 contempt hearing, Sameer exercised his Fifth Amendment rights to almost all of the questions that were asked of him, and the Court exercised its discretion to infer

from Sameer's repeated refusal to testify that, had he testified truthfully, his testimony would have supported the claims against him.  [Dkt. 169, p. 7].

This Court previously rejected Sameer's claim that working interests in oil and gas operations are not securities when it correctly held that fractional, undivided interests in oil, gas, or other mineral rights are securities.  [Dkt. 50, p. 4]  The Court also denied Sameer's First Amended Motion for Judgment on the Pleadings Pursuant to Federal Rules of Civil Procedure 12(c) and 9(b), finding that the Commission adequately pleaded claims involving Defendants' offers and sales of securities.  [Dkt. 127].  The Court found by clear and convincing evidence that, through Cambrian, Sameer utilized his skills in selling securities. [Dkt. 179, p. 14].  In addition, former Sethi Petroleum employee John Weber has admitted that he attempted to change "Sethi Petroleum's joint venture agreement, so that the interest that Cambrian was selling would not be a security." [Dkt. 169, p. 11].  Weber performed legal research, and then altered the Sethi Petroleum documents as a result of that research, in an attempt to ensure that the interests Cambrian was selling did not fit the legal definition of a security. [Dkt. 169, pp. 14-17].

Sameer was noticed, and appeared, for a sworn deposition in this case on December 4, 2015.  [Helt Decl., App. 724, 725, *et seq.*].  Throughout the deposition, Sameer was given an opportunity to answer questions concerning his formation and operation of Sethi Petroleum and his knowing deception and misappropriation of investor funds, but in every instance he invoked his Fifth Amendment rights.  For instance, he refused to answer the following questions:

- You exercised control over the entity known as Sethi Operating Company, correct?

- You exercised control over the entity known as Sethi Oil & Gas, Inc., correct?

- You made decisions, Mr. Sethi, on how funds invested by investors into a joint venture was spent, correct?

- You were a signatory on every bank account owned by Sethi Petroleum, Sethi Financial Group and each of the joint ventures, correct?

- Sethi Petroleum and Sethi Financial Group, Inc. are two entities that are treated functionally as one entity, correct?

- You often withdrew sums of cash in excess of $10,000 from bank accounts owned by Sethi Petroleum and Sethi Financial Group, Inc., correct?

- Often, that cash was then deposited into your personal checking account, correct?

[App. at 739, 744-45, 752].

In addition, Sameer executed a declaration on April 7, 2016 in which he confirmed his assertion of the privilege against self-incrimination under the Fifth Amendment to the United States Constitution and declined to testify, and stated that he would, and will, continue to decline to testify concerning all of the matters set forth in the Commission's Complaint in this case. [Declaration of Matthew J. Gulde ("Gulde Decl."), App. 803-04].

## V.
## ARGUMENT AND AUTHORITIES

### A.  The Court Should Draw a Negative Inference Against Sameer Based on His Continued Refusal to Testify.

Sameer has repeatedly refused to testify throughout this action, including during the Receiver's deposition, in response to the Commission's notice of deposition, and at hearings where he was called as a witness.  [App. 805-807]  In the Fifth Circuit, courts may draw an adverse inference from a defendant's refusal to testify in a civil case. *See Hinojosa v. Butler*, 547 F.3d 285, 295 (5th Cir. 2008).  Sameer's refusal to testify, and his repeated assertion of the Fifth Amendment while called as a witness in this matter, warrant an inference that, had he testified truthfully, his testimony would have established that he in fact

controlled Sethi Petroleum and all of its employees and related entities, and that he conducted the fraudulent offer, issuance, and sale of Sethi Petroleum securities in violation of the federal securities laws.

**B.    The Court Should Find That The Interests in Supposed Joint Venture Units Sameer Offered and Sold Were Investment Contract Securities.[5]**

Sections 2(a)(1) of the Securities Act and 3(a)(10) of the Exchange Act define "securities" to include "investment contracts." 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10).  An investment contract exists where: (1) individuals are led to invest money; (2) in a common enterprise; and (3) with the expectation that they would earn a profit solely[6] through the efforts of the promoter or of someone other than themselves.  *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99 (1946).

In *Williamson v. Tucker,* the Fifth Circuit established a test to indicate whether investors in a purported general partnership or joint venture expected to depend on the efforts of others, thus satisfying the third *Howey* element.  Under *Williamson,* an investment contract exists if <u>one</u> of the following three factors is present: (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; <u>or</u>  (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; <u>or</u> (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.  645

---

[5]   The Commission incorporates in this motion the arguments and authorities presented in its Response to Defendant Sameer P. Sethi's First Amended Motion for Judgment on the Pleadings. [Dkt. 119].

[6]   Courts do not take the word "solely" literally and have found the third element of the *Howie* test satisfied even when the investor must expend quite a bit of effort.  *See, e.g.,* *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973).

F.2d at 424.  These factors are not exhaustive.  *Id.* at 424 n. 15.  Although "[t]he test stated in *Williamson* . . . refers to the investor's experience in "business affairs," without referring to specialized knowledge, the Fifth Circuit has "made clear that the knowledge inquiry must be tied to the nature of the underlying venture."  *Long v. Shultz Cattle Co.*, 881 F.2d 129, 134 n. 3 (5th Cir. 1989) (noting that "any holding to the contrary would be inconsistent with *Howey* itself").

In evaluating whether an interest is a security, "form should be disregarded for substance," and courts should analyze the "economic reality underlying a transaction, and not [focus] on the name appended thereto."  *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 848–49 (1975).  When the *substance* of a joint venture or general partnership interest demonstrates that the interest is actually a security, a court should not hesitate to grant summary judgment for the SEC on this issue.  *See, e.g.*, *SEC v. Schooler*, 2014 WL 1660651, at *12 (S.D. Cal. Apr. 25, 2014) (granting summary judgment for the SEC on the first *Williamson* factor under analogous facts).

Although all three *Williamson* factors are present in this case, the SEC need only prevail on one *Williamson* factor as a matter of law in order to be entitled to summary judgment.  *See id.* at *10 (granting summary judgment for the SEC on the first *Williamson* factor and concluding, as a matter of law, that the "general partnership units" offered in that case were securities).

### 1.     The First *Williamson* Factor is Present as a Matter of Law Because Investors Had No Real Power Over Their Investment.

The first *Williamson* factor is established because Sethi's investors did not have any real power over their investment.[7]  [App. at 65-88].  The JVA gave Sethi Petroleum the power to

---

[7] Post-investment conduct is relevant to the intent of the parties at the time the agreement was signed.  *Shields*, 744 F.3d at 646; *Merchant Capital*, 483 F.3d at 756 (using evidence of how the partnership "actually operated to answer the question of how control was allocated at the outset"); *Maritan v. Birmingham Props.*, 875 F.2d 1451, 1458-59 (10th Cir. 1989) (stating that "intent becomes clear from the relationship which the parties accepted [after the investment is made]").  In addition to the partnership agreement and the actual operations of the enterprise, courts

manage the day-to-day operations of NDDF.  *Id.*  Sethi Petroleum had "sole and absolute

discretion" to distribute NDDF profits to investors; authority to execute oil and gas operating

agreements; power to take and hold title to NDDF's property; and authority to hire all

professionals on NDDF's behalf, including engineers, geologists and appraisers.  *Id.*  The well-

drilling that the JVA specified would be carried out by operators chosen only by Sethi, and was

the "string on which [the investors'] beads were strung."  *SEC v. C.M. Joiner,* 320 U.S. 344, 348

(1943); *see also Shields,* 744 F.3d at 646-47.

While certain significant actions – such as acquiring oil and gas interests or removing the

managing venturer – purportedly required the majority vote of investors, such voting rights were

imaginary.  *Id.*  In reality, Sethi and Sethi Petroleum did not allow NDDF investors to consult or

vote on any matter in connection with NDDF.  [App. at 699].  NDDF investors did not receive

ballots and were not provided access to Sethi Petroleum's books and records or the books and

records of NDDF.  *Id.*  Further, NDDF investors were never provided a list of other NDDF

investors and relied solely on Sethi Petroleum to manage their investment in NDDF.  *Id.*

Clearly, the investors had no access to essential information that would have permitted them to

meaningfully exercise any managerial powers they might have had.  The receiver's findings

confirm this: Sethi never conducted an investor vote or sought investor input of any kind – not

just on the NDDF investment – but across all Sethi offerings.  [App. at 724].

Not knowing the identity of the other investors made it impossible to coordinate or

communicate about the JV.  Further, not having access to Sethi Petroleum books and records,

investors had no information that would enable them to exert meaningful powers over their

---

also may look to "other documents structuring the investment, to promotional materials, to oral representations made
by the promoters at the time of the investment, and to the practical possibility of the investors exercising the powers
they possessed pursuant to the partnership agreements" to determine the investors' degree of control over the
investment.  *Koch v. Hankins*, 928 F.2d 1471, 1478 (9th Cir. 1991).

investments.  Even if the investors had a *technical* legal right to the information, which in

practice they did not, "[a]ccess to information does *not* necessarily protect an investor from

complete dependence on a third party where, as here, that same third party is the sole source of

information and advice regarding the underlying venture and the investor does not have the

expertise necessary to make the essential management decisions himself." *Long v. Shultz Cattle

Co.*, 881 F.2d 129, 135-36 (5th Cir. 1989); *see also Merchant Capital*, 483 F.3d at 761.

Moreover, Sethi Petroleum's offer and sales efforts were broad and indiscriminate, using

purchased lead lists and targeting thousands of potential investors across the country via

unsolicited sales calls and craigslist postings with little or no experience in the oil and gas

industry further demonstrates that the voting rights were illusory or a sham.  [App. 11, 714, 715];

*See, e.g., Shields,* 744 F.3d at 647; *Merchant Capital*, 483 F.3d at 758 (explaining that votes are

illusory when the promoter controls the information and does not give sufficient information for

the partners to make meaningful decisions).

Finally, it is undisputed that at the time of investment, Sethi Petroleum commingled

NDDF investors' money with Sethi Petroleum funds and other investors' funds.  [App. at 641-

42, 722-23].   With no access to Sethi Petroleum's books and records, and thus no way of

knowing that so-called partnership funds were simply poured into Sethi Petroleum's general

fund, NDDF investors had no real control over their investment.  The powers supposedly

conferred on the investors through the JV Agreements were "hollow and illusory."  *See United

States v. Leonard*, 529 F.3d 83, 90 (2d Cir. 2008) (affirming jury finding that LLC interests were

securities, since managerial rights contained in LLC formation documents were "hollow and

illusory," as those rights did not accrue until the LLCs were "fully organized"); *see also SEC v.

Continental Wireless Cable Television, Inc.*, 110 F.3d 69 (9th Cir. 1997) (unpublished)

(affirming conclusion that general partnership interests were securities "due to the sole control of the promoters . . . over investors' funds prior to the first partnership meeting"). As a matter of law, therefore, the first *Williamson* factor – lack of legal power – is undisputedly present here. Therefore, summary judgment is proper. *See Schooler,* 2014 WL 1660651 at *10.

**2. The Second *Williamson* Factor is Present as a Matter of Law, Because Investors Were Inexperienced in Oil and Gas Business.**

The second *Williamson* factor is also established in this case because the investors were inexperienced in the business of oil and gas and lacked the expertise to intelligently exercise any managerial power that may have under the contracts. As the Supreme Court has explained, an important factor in determining whether a transaction is an investment contract is "the plan of distribution," meaning whether the interests at issue are "offered and sold to a broad segment of the public." *SEC v. C.M. Joiner,* 320 U.S. 344, 353 (1943); *see Reves v. Ernst & Young,* 494 U.S. 56, 68 (1990) (relying on *Joiner*). When investments are offered to a large number of potential investors, this fact weighs heavily in favor of a finding that the investments are securities. *See Reves,* 494 U.S. at 68; *accord Marine Bank v. Weaver,* 455 U.S. 551, 559-560 (1982); *Joiner,* 320 U.S. at 352. Here, defendants used indiscriminate and broad-reaching solicitation efforts to offer and sell the JV interests, such as making unsolicited phone calls from purchased lists of names.

Consistent with these Supreme Court decisions, the *Williamson* court noted that a "scheme which sells investments to inexperienced and unknowledgeable members of the general public cannot escape the reach of the securities laws merely by labeling itself a general partnership." *Williamson,* 645 F.2d at 423 (emphasis added). The Second Circuit agreed with "the Fifth Circuit in finding that investors may be so lacking in requisite expertise, so numerous, or so dispersed, that they become utterly dependent on centralized management counteracting a

legal right of control." *Leonard,* 529 F.3d at 88-91 (emphasis added).  Similarly, the Tenth

Circuit held that allegations that a promoter "marketed oil and gas interests nationwide to

investors with little, if any, experience in the oil and gas industry by means of over 400 cold calls

a day" supports the conclusion that the second *Williamson* factor was satisfied.  *SEC v. Shields,*

2014 WL 685369, at *10 (10th Cir. Feb. 24, 2014); *see also Merchant Capital,* 483 F.3d at 758

(recognizing that geographic dispersal and lack of preexisting relationships and face-to-face

contact limited partners' ability to exercise their powers); *Schooler,* 2014 WL 1660651 at *10

(concluding that broad solicitation is a fact to consider under the second *Williamson* factor).

Here, the sheer breadth of defendants' indiscriminate solicitation of investors shows that

the second *Williamson* factor is present.  There are approximately 90 investors in NDDF and

they are scattered throughout 28 states.  [App. 641].  Sethi Petroleum solicited these investors via

unsolicited phone calls.  The vast number and dispersal of investors "left them particularly

dependent on centralized management" of their investments by defendants.  *Leonard,* 529 F.3d at

90 (looking to number and geographic dispersion of investors to evaluate their experience and

expertise under *Williamson's* second factor).  This left the varied and scattered group of

investors, with virtually no ability to coordinate or communicate, as they must, in order to try

and manage their investments.

Given the scattershot method in which these investors were solicited and their lack of

industry knowledge [App. 698, 716] at the time of the investment, it is clear that investors did

not have the necessary experience in oil and gas to manage the JVs, even if they had the power to

do so.  Thus, the second *Williamson* factor is satisfied, and summary judgment on this issue is

proper.  *See Shields,* 2014 WL 685369, at *10.

### 3.      The Third *Williamson* Factor is Present as a Matter of Law.

Under the third *Williamson* factor, a dependency relationship exists when the investors rely

"on the managing partner's unusual experience and ability in running that particular business."

*Williamson,* 645 F.2d at 423.  As noted in *Williamson,* even a partner knowledgeable in the

particular investment "may be left with no meaningful option when there is no reasonable

replacement for the investment's manager."  *Id.*  In such a situation, "a legal right of control

would have little value if partners were forced to rely on the manager's unique abilities."  *Id.; see*

*also Merchant Capital,* 483 F.3d at 763 ("The third factor provides that, even if the arrangement

gives the partners some practical control, the instrument is an investment contract if the investors

have no realistic alternative to the manager.").

In this case, the undisputed facts demonstrate that Sameer and his company structured

and operated the NDDF investment leaving investors completely dependent on the company's

supposed entrepreneurial and managerial abilities, and without any reasonable alternative

management option.  Sethi Petroleum's cold-call sales regime was built around touting the

company's established relationships with major players in the oil and gas industry – companies

like Hess, Conoco Phillips, Exxon Mobil, and Continental Resources.  [*See, e.g.*, App. at 6, 10,

22, 39, 204-05, 716].  If the NDDF investors sought to depose Sameer and Sethi Petroleum as

managing venture of the NDDF project, they would forego these purported relationships and the

"unusual experience and ability" that Sethi Petroleum touted during the NDDF offering.  [*See,*

*e.g.*, App. at 42-44, 206, 214].

Additionally, if NDDF investors somehow wrestled power away from Sethi Petroleum,

they would have found so-called partnership funds hopelessly commingled with the company's

own funds and those of other joint ventures.  [App. at 641-42].  *Merchant Capital* held that

*Williamson's* third factor was present on similar facts. In that case, funds from investors in several purportedly separate partnerships were pooled by Merchant Capital, the managing partner for all the partnerships, and used to purchase assets held by a third-party. *Merchant Capital*, 483 F.3d at 764. Under Merchant Capital's agreement with the third party, Merchant Capital could request return of the assets, but the individual partnerships "had no contractual right to demand the return of the [assets]." Thus, even if an individual partnership managed to replace Merchant, it would find that its assets were tied up in fractional share form in [assets held by the third party]." *Id.* Because of this pooling of funds, "Merchant effectively had permanent control over each partnership's assets" and the partnerships lacked "any realistic alternative to management by Merchant." *Id.*[8]

There is no genuine issue of fact as to whether NDDF investors were dependent on Sethi Petroleum's touted experience and ability. Indeed, there is no genuine question as to the application of any of the *Williamson* factors in this case. The NDDF offering was, without question, the offer and sale of a security under the laws of the United States.

**C.     The Commission Is Entitled To Summary Judgment On Its Fraud Claims.**

Similarly, there is no genuine question of material fact as to the fraud claims presented against Sameer Sethi.

**1.     Elements of Securities Fraud**

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), prohibits fraud in the offer or sale of securities, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit fraud in connection with the purchase or sale of any

---

[8] Other courts have held that investors were granted only illusory control over an investment where the enterprise was run by pooling investors' interests so that an individual investor had no control over the operation as a whole, even if he had some control over a subsidiary portion. See e.g., *Koch*, 928 F.2d at 1478, 1480; *Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918, 924-25 (4th Cir. 1990).

security.  To establish a prima facie case under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5, the SEC must prove by a preponderance of the evidence: (1) a material misrepresentation, omission of material fact, or other fraudulent device; (2) in connection with the purchase, offer, or sale of a security; (3) with the requisite mental state.  *Aaron v. SEC,* 446 U.S. 680, 695 (1980); *SEC v. Gann,* 565 F. 3d 932, 936 (5th Cir. 2009); *SEC v. Seghers,* 298 F. App'x 319, 328 (5th Cir. 2008).  Violations of Section 17(a)(1), Section 10(b), and Rule 10b-5 require a showing of scienter.  *Aaron,* 446 U.S. at 697.  Violations of Sections 17(a)(2) and (a)(3) require, at most, a showing of negligence.[9]  *See SEC v. Hopper,* 2006 WL 778640 at *9 (S.D. Tex. Mar. 24 2006).

If the Court finds that Sethi Petroleum's JV units were securities, the second element has been satisfied:  the statements were "in connection" with the offer, purchase, or sale of securities.[10]  Therefore, for this motion, the Commission need only establish that Sameer – directly, indirectly, as a control person under Exchange Act Section 20(a), or through another person or entity under Exchange Act Section 20(b) – made material misrepresentations or omissions, or used a fraudulent device, and acted with the requisite mental state.

## 2.     Sameer Violated the Anti-Fraud Provisions of the Federal Securities Laws

Defendants have violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 CFR § 240.10b-5] thereunder. Additionally, Defendant Sethi has violated 20(b) of the Exchange Act [15 U.S.C. § 78t(b)] and is liable, as a control person under Section 20(a) of the Exchange Act thereunder [15 U.S.C. § 78t(a)

---

[9]   The Supreme Court has never addressed whether negligence is necessary to prove a violation of Sections 17(a)(2) and (a)(3).  In fact, the Court has suggested that, at least under Section 17(a)(3), the focus is only on the "effect of particular conduct on members of the investing public, rather than upon the culpability of the person responsible" for the conduct.  *Aaron,* 446 U.S. at 696-97.

[10]   The "in connection with" requirement "is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction.'"  *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993).

and (b)], for Sethi Petroleum's primary violations of Section 10(b) of the Exchange Act and Rule

10b-5 thereunder.  These statutes collectively prohibit both fraudulent statements and omissions and

fraudulent schemes relating to the offer, purchase, or sale of securities through use of, among other

things, the mails and instrumentalities of interstate commerce.  Section 17(a)(1) of the Securities Act

[15 U.S.C. § 77q(a)(1) ] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17

CFR § 240.10b-5] thereunder, require a finding of *scienter* to establish a violation; however, Sections

17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)] do not.  *Aaron v. SEC,* 446 U.S.

680, 697 (1980); *see also Steadman v. SEC*, 603 F.2d 1126, 1133-34 (5th Cir 1979), *aff'd*, 450 U.S.

91 (1981).  As discussed more fully below, Defendants violated these provisions by making false

statements and conducting a fraudulent scheme.

### a.      Sameer used the Mails and Instrumentalities of Interstate Commerce.

To violate the anti-fraud provisions, the misstatements or scheme must use, among other

things, the mails or instrumentalities of interstate commerce.  Section 17(a) of the Securities Act

[15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17

CFR § 240.10b-5] thereunder.  Here, Defendants used the mails, telephonic communications, and

electronic mail to solicit investors through material misrepresentations and omissions. [*e.g.*, App.

at 697-701, 707-13, 714-20].

### b.      Sameer Engaged in the Offer, Purchase and Sale of Securities.

The "joint venture" interests offered and sold by Defendants are securities as discussed

above in Section V(B), *infra.*

### c.      Sameer Made Material Misrepresentations To Investors.

Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a] makes it unlawful for any person,

in the offer or sale of a security, by the use of any means or instruments of transportation or

communication in interstate commerce or by use of the mails, directly or indirectly, to obtain money

or property by means of any untrue statement of a material fact or any omission to state a material

fact necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading.

Similarly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17

CFR § 240.10b-5(b)] thereunder make it unlawful for any person, directly or indirectly, by the use of

any means or instrumentality of interstate commerce or of the mails, or of any facility of any national

securities exchange, in connection with the purchase or sale of a security, to, among other things,

make any untrue statement of a material fact or omit to state a material fact necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading

in connection with the purchase or sale of any security.  The "in connection with" requirement of

Section 10(b) and Rule 10b-5 is satisfied if the fraud touches upon a securities transaction.  *See SEC*

*v. Zandford*, 535 U.S. 813, 819-20 (2002).

Sethi and Sethi Petroleum solicited investors by making a number of materially false and

misleading statements about the NDDF.  The facts misrepresented to, and withheld from,

investors in this case are material.[11]  As seen in the Statement of Undisputed Facts, Sethi's

material misrepresentations include: (i) falsely describing Sethi's criminal history; (ii) falsely

describing Sethi's and Sethi Petroleum's regulatory history; (iii) falsely claiming partnerships

with major oil companies; (iv) misrepresenting the scope of the NDDF venture; (v)

misrepresenting expected returns; and (vi) stating that investors funds would be used in

accordance with the Operating Documents when, in reality, those funds were diverted for

---

[11]      Information is material if there is a substantial likelihood that disclosure of the misstated or omitted fact
would have significantly altered the "total mix" of information to be considered by a reasonable investor.  *Basic Inc.
v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).
*See also, Koehler v. Pulvers*, 614 F. Supp. 829, 842 (S.D. Cal. 1985) (finding omissions and misrepresentations
about "the use of investor funds" material).

purposes not disclosed to investors.  A reasonable investor would have considered all of these misrepresentations to be important in investment deliberations.

### d.    Sameer Conducted a Fraudulent Scheme

In addition to their fraudulent statements, Sethi and Sethi Petroleum also conducted a fraudulent scheme.  Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)] make it unlawful for any person, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, to, among other things, employ any device, scheme, or artifice to defraud, or to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.  Similarly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 CFR § 240.10b-5(a), (c)] thereunder make it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate comer or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of a security, to, among other things, employ any device, scheme, or artifice to defraud, or to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. The "in connection with" requirement of Section 10(b) and Rule 10b-5 is satisfied if the fraud touches upon a securities transaction.  *See Zandford*, 535 U.S. at 819-20.

In *Zandford*, addressing a fraudulent scheme under Rule 10b-5(a) and a fraudulent course of business under Rule 10b-5(c), the high Court concluded: "[i]ndeed, each time respondent 'exercised his power of disposition (of his customers' securities) for his own benefit,' that conduct, 'without more,' was a fraud."  *Zandford*, 535 U.S. at 815; *see also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152 (1972) (noting that while Rule 10b-5(b) targets false statements or omissions, paragraphs (a) and (c) "are not so restricted").

To persuade investors to invest in NDDF, Defendants engaged in a practice and course of business of making untrue statements of material facts and material omissions, including those described in detail above.  They also engaged in a practice and course of business of immediately misappropriating NDDF investor funds.  [App. at 641-645, 722-24].  Instead of acquiring working interests in wells operated by major companies, Defendants spent the majority of invested funds on sales commissions, Sethi Petroleum overhead, and withdrawals by Sethi Petroleum, Sameer Sethi, and Praveen Sethi.  *Id.*  For perspective, Sethi Petroleum used more than twice as many investor funds for marketing and payroll expenses ($2.14 million) as in the drilling and completion of NDDF wells ($900,000).  [App. at 641-642].  Though they had only raised $4 million of the $10 million they anticipated, Defendants had already overspent budgeted amounts for non-drilling expenses by a wide margin.  *Id.*  These fraudulent practices demonstrate that the proposed defendants were engaged in an overall scheme to defraud.  *See Zandford*, 535 U.S. at 819-21; *Grippo v. Perazzo*, 357 F.3d 1218, 1223 (11th Cir. 2004).

### e.        Sameer Acted with a High Degree of *Scienter*

To establish violations of the antifraud provisions, the SEC must also establish that Defendants acted with *scienter*.  *Aaron v. SEC*, 446 U.S. 680, 691 (1980).  There is, however, no *scienter* requirement for actions under Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2), (3)].  *Scienter* is the "mental state embracing intent to deceive, manipulate or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  And in the Fifth Circuit, *scienter* may be established by showing that the defendants acted intentionally or with severe recklessness.  *See Broad v. Rockwell Int'l Corp.*, 642 F. 2d 929 (5th Cir.) *en banc, cert. denied* 454 U.S. 965 (1981).

Here, Defendants acted with *scienter* as they intentionally defrauded investors. Defendants knew that the oral and written misstatements they made to investors regarding their investments were false at the time they made them.  Defendants also knew that they were misusing investor funds.  [App. at 641-642, 722-24].  Even after misappropriating the funds, Defendants continued to solicit investment in NDDF, knowing that the representations therein did not match their history of misappropriation.  [App. at 193, 714-20].  These facts demonstrate *scienter* in the extreme.  Later, as if to eliminate any doubt about his intention to deceive, Sameer and his associates established Cambrian Resources, LLC *the day after* the Court entered its Preliminary Injunction barring him from offering securities.  (Dkt. 169, p. 14).  This Court has already determined, by clear and convincing evidence, that Sameer "hatched and executed" the scheme to establish Cambrian for the purpose of evading the Court's order.  (*Id.*).

> **f.     Sameer Is Liable as a Control Person for Sethi Petroleum's Violations of the Antifraud Provisions of the Securities Laws**

To establish joint and several liability as a control person under Section 20(a) of the Exchange Act, a plaintiff must show an underlying violation and a person's control over the violating entity.  To establish the "control" prong, a plaintiff need only show that the alleged control person possessed "the power to control [the primary violator], not the exercise of the power to control." *In re Enron Corp. Sec., Derivative & ERISA Litig*., 235 F. Supp. 2d 549, 595 (S.D. Tex. 2002) (citing *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958).  In this case, as described above, there is no question that Sethi Petroleum and Sethi violated the antifraud provisions of the federal securities laws.  Sameer Sethi was Sethi Petroleum's President and sole Managing Member.  [App. at 3, 18, 99].  Sethi created, owned, and managed the company from at least November 7, 2011 to May 2015, and controlled its operations.  *Id.* Therefore, in addition to principal liability, Sethi is also jointly and severally liable for his

company's violations because he possessed the power to control Sethi Petroleum at all relevant times.  *Id*.

> **g.      Sameer also Violated Securities Laws Through the Actions of Others**

Section 20(b) of the Exchange Act makes it unlawful for any person to violate the antifraud provisions of the federal securities laws "through or by means of another person."  As described above, Sethi directed his sales staff to provide information that he knew to be false. [App. at 714-20].  In late 2014, Sethi was directing his salespeople to tell prospective investors that (1) NDDF had already purchased interests in 12 profitable wells, which were producing a total of 1 million barrels of oil per month; (2) new investors would immediately begin receiving revenue checks from the wells; (3) the remaining 8 wells would be drilled by the end of 2014; and (4) investors could expect 30% to 60% returns on investment per year.  [App. at 716].  As Sethi knew at the time, each of these claims was false.  Sethi therefore knowingly and intentionally violated the securities laws and did so directly and indirectly through his sales staff. *See SEC v. Daifotis*, 874 F. Supp. 2d 870, 881 (N.D. Cal. 2012) (defendant was maker under *Janus* of misstatements communicated to public by financial consultants, when defendant made the misstatements internally to financial consultants with the "intent or reasonable expectation" that they be relayed to the investing public); *Anderson v. McGrath*, No. CV–11–01175, 2013 WL 1249154, at *7 (D. Ariz. Mar. 26, 2013) (holding that a plaintiff sufficiently pleaded that a defendant was the maker of a statement under *Janus*, even though the statement was communicated from the defendant to the plaintiff by a third-party broker, when the statement was made with the intent that it be repeated to investors).

# VI.
## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's motion for summary

judgment as to Sameer Sethi, and grant it such other relief as it may be entitled.


DATED: September 14, 2016                    Respectfully submitted,


                                            /s/Matthew J. Gulde
                                            Matthew J. Gulde
                                            Illinois Bar No. 6272325
                                            Jessica B. Magee
                                            Texas Bar No. 24037757
                                            SECURITIES AND EXCHANGE COMMISSION
                                            Burnett Plaza, Suite 1900
                                            801 Cherry Street, Unit #18
                                            Fort Worth, TX  76102-6882
                                            (817) 978-1410 (MJG)
                                            (817) 978-4927 (fax)
                                            guldem@sec.gov

                                            ATTORNEYS FOR PLAINTIFF
                                            SECURITIES AND EXCHANGE COMMISSION


## CERTIFICATE OF SERVICE

On September 14, 2016, I electronically submitted the foregoing document with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the Court.


                                            /s/ Matthew J. Gulde
                                            Matthew J. Gulde