# United States District Court
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § § | |
| v. | § § | Civil Action No. 4:15-CV-00338 Judge Mazzant |
| SETHI PETROLEUM, LLC and SAMEER P. SETHI | § § § § | |

## <u>AMENDED MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiff's Motion for Summary Judgment as to Sameer Sethi (Dkt. #195). After reviewing the relevant pleadings and motion, the Court finds that the motion should be granted.

## BACKGROUND

As early as January 2014, Defendant Sameer Sethi and his company, Sethi Petroleum, LLC ("Sethi Petroleum"), began offering investors positions in the Sethi-North Dakota Drilling Fund-LVIII Joint Venture ("NDDF"). This purported "joint venture" offered investors returns from two sources: oil-and-gas revenues and tax benefits from oil-and-gas exploration and production activities. The NDDF was promoted primarily through two documents: a Confidential Private Placement Memorandum ("PPM") and an Executive Summary (collectively, the "Offering Documents").

Sethi Petroleum marketed NDDF interests through a twenty-person sales staff using cold calls, pitch scripts, and purchased lead lists. Defendant regularly visited Sethi Petroleum's boiler room to provide sales tips and directions on statements to make to potential investors. Once salespeople determined that an investor was interested in NDDF and was "accredited," Sethi Petroleum would send Offering Documents to the potential investor through the United States

mails. An "accredited" investor is a person with a net worth over $1,000,000 independently or combined with a spouse or with individual income over $200,000 or joint income over $300,000.

In the PPM, Sethi Petroleum stated its intention to raise $10 million to exploit its exclusive rights to purchase mineral interests and to participate in oil and gas development on 200,000 acres in the Williston Basin of North Dakota, South Dakota, and Montana. Each of the fifty units was offered at $200,000. Sethi Petroleum estimated that 70% of investor funds would be used for the acquisition, drilling, and completion of the wells and that the remaining 30% would be spent on legal, engineering, syndication, and management expenses.

The PPM further stated that the investors' funds would be used to purchase approximately 62.5% net working interest in at least twenty wells. The Offering Documents further state that NDDF's wells would be "operated by publicly traded and/or major oil and gas companies" such as Continental Resources, ExxonMobil, Hess Corporation, and ConocoPhillips (APP205).[1] In August 2014, NDDF acquired a fractional working interest from Irish Oil & Gas ranging from 0.15% to 2.5% in eight or nine wells. The operators of the acquired wells were Crescent Point Energy U.S. Corp., Oxy USA Inc., and Slawson Exploration Co. Of those wells, only six produced oil or gas. Two wells were voluntarily cancelled by their operators in December 2014 and January 2015. The remaining wells produced a combined total of 9,147 barrels of oil in January 2015; 13,995 barrels of oil in February 2015; and 12,357 barrels of oil in March 2015. Since the appointment of a receiver for all of Sethi Petroleum in May 2015, all of the wells associated with Sethi Petroleum have produced total proceeds of $2,489.85.

---

[1] The SEC incorporates the Appendix filed in support of the SEC's Motion for Temporary Restraining Order (Dkt. #4, Exhibit 2) as evidence for this motion. In addition, the SEC has attached additional materials to this motion beginning with APP722, supplementing the TRO's 721-page Appendix. The Court will refer to all of these materials in reference to their Appendix citation.

The PPM alerted investors to various risk factors associated with the NDDF venture including: "The venture is newly formed and has limited financial resources"; "There is no minimum capitalization required before subscriptions will be utilized for venture operations"; "Our prior performance is not an indication of how the venture will perform"; "The prospect wells may not be productive"; "You may not recover your investment in the venture"; "We may profit from the venture's operations even if the venture is not profitable" (APP28–34).

The Executive Summary contained projections for the NDDF venture including a projection for annual returns ranging from 32% to 254% on first year investments. These projections were based on a $90/barrel price of oil. In March 2015, the price per barrel ranged from $43.36 to $51.53.[2]

Attached to PPM was a Joint Venture Agreement ("JVA"). The JVA provided by Sethi Petroleum established the NDDF venture and appointed Sethi Petroleum as Managing Venturer. The JVA gave investors control of NDDF's affairs and operations, but empowered Sethi Petroleum to manage the venture's day-to-day operations. Among the powers granted to Sethi Petroleum were "sole and absolute discretion" to distribute NDDF profits to investors; authority to execute oil and gas operating agreements; power to take and hold title to NDDF's property; and authority to hire all professionals on NDDF's behalf, including engineers, geologists, and appraisers. Certain significant actions—such as acquiring oil and gas interests or removing the Managing Venturer—required the majority vote of investors. No evidence shows that a vote was ever conducted or that a list of investors was ever provided to NDDF investors.

The PPM stated that "there will be no commingling of funds between the Venture and Sethi Petroleum or any Affiliate thereof other than may temporarily occur during the payment of

---

[2] Based on U.S. Energy Information Institute reports for daily spot prices of crude oil, Cushing, OK. U.S. Energy Info. Admin. *Petroleum & Other Liquids* (Nov. 9, 2016), http://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n= pet&s=rwtc&f=d.

bills and/or distributions by Sethi Petroleum on behalf of the Venture." From January 28, 2014, through March 9, 2015, Sethi Petroleum raised over $4 million from ninety investors in twenty-eight states across the country. From February 6, 2014 through March 21, 2015, Defendant and Praveen Sethi moved $3.15 million of investor funds to the Sethi Petroleum general account in more than eighty account transfers.[3]

On May 14, 2015, the Court granted the SEC's emergency *ex parte* request and issued a temporary restraining order, asset freeze, and other injunctive relief (the "TRO") against Sethi Petroleum and Defendant (Dkt. #11). The Court also appointed a receiver over Sethi Petroleum (Dkt. #12). On May 26, 2015, the Court issued an Agreed Order Granting Preliminary Injunction, Asset Freeze, and Other Relief (the "Preliminary Injunction") (Dkt. #23).

On December 4, 2015, Defendant was noticed, and appeared, for a sworn deposition in this case. Throughout the deposition, Defendant invoked his Fifth Amendment rights to nearly every question (Dkt. #195, Exhibit 2-A). On April 7, 2016, Defendant executed a declaration stating that he would assert his Fifth Amendment privilege to decline to testify, including without limitation, testimony regarding his personal information, assets, conduct related to Sethi Petroleum, receipt of funds in any way related to Sethi Petroleum, expenditures of funds, relationships related to himself or Sethi Petroleum, any efforts to raise money from investors, and communications with Sethi Petroleum (Dkt. #195, Exhibit 2-A).

On September 14, 2016, the SEC filed this Motion for Summary Judgment as to Sameer Sethi (Dkt. #195). On October 11, 2016, Defendant filed a response (Dkt. #211). On October 18, 2016, the SEC filed a reply (Dkt. #218). On November 1, 2016, Defendant filed a sur-reply (Dkt. #220).

---

[3] It is disputed whether these transfers were legitimately used for expenses and distributions as stated in the PPM, or whether they were fraudulent. The Court needs not decide because the fact that they occurred is not in dispute.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing

*Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "'significant probative evidence'" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but must "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

### Evidentiary Objections

Defendant moves to strike portions of Plaintiff's Appendix that do not comport with the requirements of Federal Rule of Civil Procedure 56. First, Defendant moves to strike statements by Marcus Helt that are conclusory or without foundation. Statements setting forth conclusory facts or conclusions of law are insufficient evidence on a motion for summary judgment. *See Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997). An affidavit in support of a motion must be made on "personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4).

The Court finds that several statements in Marcus Helt's affidavit are conclusions of law. Thus, the Court sustains Defendant's objection and excludes Helt's statements that, "the entire Sethi Enterprise was a sham"; "the Sethi Enterprise was insolvent; "The Sethi Enterprise received approximately $13 million of cash under false representations"; and "the enterprise never had a possibility, let alone probability, of being a viable business."

Next, Defendant seeks to strike hearsay portions of the declarations of Michael Martin and Joseph Barbaria. The Court overrules this objection. Martin's and Barbaria's statements are supported by the record before the Court. Additionally, Defendant has not specified which statements he perceives to constitute hearsay. The Court finds that the statements by Sethi Petroleum employees are not hearsay because they are not offered for the truth of the matter asserted, but rather to prove their falsity. *See* FED. R. EVID. 801(c)(2). Further, Barbaria's statements regarding what Defendant told him would be admissible as statements by a party opponent. FED. R. EVID. 801(2). Therefore, the Court overrules this objection.

### Negative Inference

The SEC argues that the Court should draw an adverse inference from Defendant's refusal to testify to establish that (1) Defendant did in fact control Sethi Petroleum and all of its employees and related entities and (2) that he conducted the fraudulent offer, issuance, and sale of Sethi Petroleum venture shares (Dkt. #195 at pp. 21–22). Defendant responds that a negative inference is inappropriate at the summary judgment stage because the Court is required to make all reasonable inferences in favor of the nonmovant (Dkt. #211 at p. 32).

In the Fifth Circuit, courts may draw an adverse inference from a defendant's refusal to testify in a civil case. *See Hinojosa v. Butler*, 547 F.3d 285, 295 (5th Cir. 2008). This inference is available to the court on summary judgment. *See State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990). However, a court cannot decide an issue on summary judgment against a party solely on the basis of the party's invocation of the Fifth Amendment. *Id.* at 119, n.2 (citing *United States v. White*, 589 F.2d 1283, 1287 (5th Cir. 1979)). A court may only decide an issue if there is any independent evidence in addition to the invocation. *Gulf Coast Bank & Trust Co. v. Stinson*, No. 2:11-CV-88-KS-MTP, 2013 WL 30136, at *4, n.2 (S.D.

Miss. Jan 2, 2013). Therefore, while the Court declines to base its decisions solely on Defendant's assertion of Fifth Amendment rights, it may consider such silence as a failure to dispute other evidence.

<b>Joint Venture Units Were Investment Contract Securities</b>

The SEC argues that the joint venture units are securities as investment contracts because they meet each of the three factors from *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981) (Dkt. #195 at p. 15). Defendant argues that the SEC's arguments for each factor are insufficient to meet their heavy burden to prove an investment contract on summary judgment (Dkt. #211 at p. 17). Specifically, Defendant argues that no factor is met because the JVA gives investors actual power over the NDDF venture and each venturer represented that he or she possessed the requisite knowledge and experience to exercise those powers (Dkt. #211 at pp. 19–22).

A security is broadly defined under the Securities Act and the Exchange Act. 15 U.S.C. §§ 77b(a)(1) & 78c(a)(10). An investment contract exists where: (1) individuals are led to invest money; (2) in a common enterprise; (3) with the expectation that they would earn a profit solely through the efforts of the promoter or of someone other than themselves. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946). The first two elements are clearly established and are not seriously disputed. Therefore, the issue for the Court is whether the investors had an expectation that they would earn a profit solely through the efforts of someone other than themselves.

The leading Fifth Circuit case interpreting *Howey's* third element is *Williamson v. Tucker*. In *Williamson*, the Fifth Circuit held that the term "solely" is interpreted in a flexible manner, not in a literal sense. *Id.* at 418. In evaluating whether an interest is a security, "form should be disregarded for substance," and courts should analyze the "economic reality underlying a transaction, and not [focus] on the name appended thereto." *United Hous. Found.,*

*Inc. v. Forman*, 421 U.S. 837, 848–49 (1975). Therefore, to determine whether profits are expected to come "solely" from the efforts of others, the Fifth Circuit adopted the Ninth Circuit's test, which defined the critical question as "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 (5th Cir. 1974) (citing *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)).

In *Williamson*, the Fifth Circuit concluded that a general partnership or joint venture interest may satisfy the third *Howey* element if the investor can establish any one of the following factors: (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers. 645 F.2d at 424. These factors are not exhaustive. *Id.* at 424, n.15. Although "[t]he test stated in *Williamson* . . . refers to the investor's experience in "business affairs," without referring to specialized knowledge, the Fifth Circuit has "made clear that the knowledge inquiry must be tied to the nature of the underlying venture." *Long v. Shultz Cattle Co.*, 881 F.2d 129, 134 n.3 (5th Cir. 1989) (noting that "any holding to the contrary would be inconsistent with *Howey* itself").

Furthermore, the Fifth Circuit has stated that "a strong presumption remains that a general partnership or joint venture interest is not a security." *Youmans v. Simon*, 791 F.2d 341, 346 (5th Cir. 1986). The *Youmans* court made it clear that "[a] party seeking to prove the

contrary must bear a heavy burden of proof." *Id*. (citing *Williamson*, 645 F.2d at 424). Therefore, the Court will examine each of the *Williamson* factors to determine if the SEC has met its heavy burden in establishing that the type of interest that Defendant sold was actually a security.

The First <em>Williamson</em> Factor: Venturers' Actual Power

The first *Williamson* factor the Court considers is whether the agreement between the parties gives the venturer little to no power, such as a limited partner would have. 645 F.2d at 424. A general partnership or joint venture interest usually does not fall within the broad definition of "investment contract." *Williamson*, 645 F.2d at 419–421. However, agreements that are more akin to limited partnerships may be considered a security under the statutory definition. *Youmans*, 791 F.2d at 346. Limited partners have limited liability, are typically unable to dissolve the partnership or bind other partners, and have virtually no power to take an active role in the management of the partnership. *Id.*

The SEC argues that investors did not have any real power over their investment because Sethi Petroleum had "sole and absolute discretion" to distribute NDDF profits to investors; authority to execute oil and gas operating agreements; power to take and hold title to NDDF's property; authority to hire all professionals on NDDF's behalf; and to choose operators for drilling on NDDF's wells (Dkt. #195 at pp. 16–17). The SEC supports its arguments with unrebutted declarations from an accountant, an investor, a salesman, and the Receiver.

Defendant points to several of the venturer's alleged powers in support of his argument that the venturers had real power, making the NDDF shares not a security. According to Defendant, Venturers could remove the managing venturer, could propose and pass amendments to the [JVA], calling meetings, develop rules and procedures for holding meetings, and vote on "any matter that may be submitted for decision by the Venturers in accordance with the express

terms of [the JVA] or under the provisions of the TBOC" (Dkt. #211 at p. 20). Defendant then argues that it is reasonable to infer that a venturer with these types of rights would actually check up on the performance of the NDDF venture (Dkt. #211 at p. 20). Defendant further argues that it requires an unfavorable inference to assume that just because one investor had no power then all investors did not have power (Dkt. #211 at p. 21).

This case is similar to *Arcturus*, where the joint venturers also had the ability to call meetings and the voting power to remove the managing venturer. *SEC v. Arcturus*, 171 F. Supp. 3d 512, 525 (N.D. Tex. 2016). The *Arturus* court pointed out that "[i]f the venturers did not have any contact information for the other venturers . . . how could the venturers ever satisfy the minimum percentage interest to exercise these powers[?]" *Id.* The court went on to state that "[a]ny right to vote or call a meeting that required a percentage of the venture interest was absolutely hindered by the inability of the venturers to contact each other." *Id.*

Here, Sethi Petroleum solicited investors from across the country with no prior relationships to Sethi Petroleum or to each other. Further, Sethi Petroleum did not provide access to its books or records. Therefore, the summary judgment evidence establishes that the investors could not exercise any powers they had because they did not know the names or addresses of other investors. *Arcturus*, 171 F. Supp. at 525; *see also SEC v. Merchant Capital, LLC*, 483 F.3d 747, 758 (11th Cir. 2007) (finding barriers to exercise of powers were compounded because the investors "were geographically dispersed, with no pre-existing relationships").

Furthermore, even if the investors could contact each other or otherwise force a vote, Sethi Petroleum's misrepresentations frustrated any meaningful management powers of the investors. Michael Martin ("Martin"), an NDDF investor, asked multiple people for a status update of his investment and was repeatedly stymied. First, Martin was given a letter by Sethi

Petroleum's Vice President, Michael Davis ("Davis") who told Martin that Sethi Petroleum had engaged independent contractors to provide such updates. Further, Davis told Martin that he would provide an up-to-date report on the status of Martin's investment. Martin has never received either the name of the independent contractor or the report. Davis further directed Martin to call Diane Cimoperlik ("Cimoperlik") if he had any further questions. When Martin reached Cimoperlik, she told him that only eight of the twenty promised NDDF wells had been drilled. However, when Martin asked for additional detail during that call and in a follow up email, he did not receive any response.

One of Sethi Petroleum's salesmen, Joseph Barbaria ("Barbaria"), stated in his declaration that the "closers" for Sethi Petroleum were instructed to reassure investors that they would eventually receive revenue checks, and that Sethi Petroleum had interests in more wells than it actually did. Barbaria was personally contacted by one investor who had concerns about receiving status updates on his investments. On December 23, 2014, Davis sent an email to the closers stating that NDDF only had interest in five wells, not twelve. However, William Shavers, Sethi Petroleum's Sales Director, immediately told the closers that the email was sent in error and they should continue telling prospective investors that NDDF had interest in twelve wells.

Defendant argues that it is reasonable to infer that at least some investors took steps privately to track the performance of the NDDF venture to not be reliant on the managing venture (Dkt. #211 at p. 20). However, as the foregoing facts demonstrate, investors did take steps to learn of the NDDF venture, but were stymied at every step along the way and when they were given information, it was inconsistent at best. The Fifth Circuit has stated that "access to information does not necessarily protect an investor from complete dependence on a third party where, as here, that same third party is the sole source of information and advice regarding the

underlying venture and the investor does not have the expertise necessary to make the essential management decisions himself." *Long*, 881 F.2d at 135–36; *see also Arcturus*, 171 F. Supp. 3d at 530–31; *Merch. Capital*, 483 F.3d at 761. The Eleventh Circuit has determined that powers are illusory when the promotor controls how much information is given to investors, and he does "not submit sufficient information for the partners to be able to make meaningful decisions." *Merch. Capital*, 483 F.3d at 758. Even though Martin eventually obtained information about the NDDF venture, his convoluted path to that discovery demonstrates that he was reliant upon Sethi Petroleum to provide that information.

Therefore, the summary judgment record establishes that the majority of the venturers' powers were delegated to Sethi Petroleum, and any power the venturers still possessed could not be exercised because the necessary information was controlled by Sethi Petroleum. Because the first *Williamson* factor proves the venturers' dependence on the efforts of Sethi Petroleum, the Court finds the third *Howey* element is established. *See Williamson*, 645 F.2d at 424. Accordingly, Sethi Petroleum's joint venture is an investment contract and, therefore, a security. *See Arcturus*, 171 F. Supp. 3d at 527.

<u>The Second *Williamson* Factor: Venturers' Experience and Knowledge</u>

Even if the first *Williamson* factor had not been satisfied, the Court could look to the second *Williamson* factor to establish complete dependence. *Id.* Under this factor, the Court considers whether the venturers were inexperienced and lacked expertise in the oil and gas well business. The Court finds the SEC presented sufficient evidence to establish this second factor.

Courts look to the investor's experience and knowledge in the particular business of the venture at issue, not the investor's general business experience. *Long*, 881 F.2d at 135 n.3 (noting that *Williamson* "made clear that the knowledge inquiry must be tied to the nature of the

underlying ventures."); *see Howey*, 328 U.S. at 296. The critical inquiry is whether the investors are inexperienced and unknowledgeable in this particular business, making it more likely they would "be relying solely on the efforts of the promoters to obtain their profits." *Merch. Capital*, 483 F.3d at 762; *see also Long*, 881 F.2d at 134 ("[A] plaintiff may establish reliance on others within the meaning of *Howey* if he can demonstrate not simply that he did not exercise the powers he possessed, but that he was incapable of doing so.").

Courts have consistently held that when offerings are made by hundreds of cold calls per day, via a nationwide network of investors with little, if any, experience in the oil and gas industry, then one can conclude that the investors were so inexperienced or unknowledgeable in business that they were not capable of "intelligently exercising their partnership powers." *See, e.g.*, *Arcturus*, 171 F. Supp. 3d at 528.

Defendant argues that the SEC has not produced enough evidence to meet its burden on summary judgment and even if it has, the statements in the JVA that each venturer has "the requisite business knowledge and experience" is sufficient to satisfy the requisite knowledge requirement (Dkt. #211 at p. 22). The SEC has provided unrebutted declarations from its investigating accountant, a former NDDF employee, and an investor, to prove that NDDF sought out and obtained investors who had no experience in the oil and gas industry. The Court finds that these uncontroverted statements from multiple sources are sufficient to establish that no genuine issue of material fact exists as to the venturers' experience and knowledge.

The sheer breadth of indiscriminate solicitation of investors shows that the second *Williamson* factor is present. There are approximately ninety investors from at least twenty-five different states. Sethi Petroleum employed between ten and twenty "fronters" who initiated calls through automatic dialing and purchased leads list. Once a "fronter" determined that the caller

was accredited and interested in purchasing a joint venture interest, the call would be sent to a "closer" to make the sale. Fronters and closers were told that they could sell to investors that had no prior experience making oil and gas investments as long as they were "accredited investors." An "accredited investor" was simply a rating on how much money a person had. Sethi Petroleum employed eight closers. All employees in the call center, with the exception of two successful closers, worked from 8 a.m. to 5 p.m.. The fronters and closers were told to continually make calls to potential investors.

Further, the testimony of an NDDF investor, Martin, shows that he was solicited despite lacking relevant knowledge or experience. When Martin was first contacted by a Sethi Petroleum Vice President, Jerry Impini ("Impini"), Martin said that he had no experience in oil and gas. Nevertheless, Sethi Petroleum continued to ensure that Martin was an "accredited investor" and followed through with the sale. Whether or not an individual is an accredited investor is unrelated to whether or not they are knowledgeable about oil and gas. Further, Defendant has failed to produce any evidence supporting his argument that a majority, if not all, of the investors possessed the requisite knowledge. Considering the circumstances under which Sethi Petroleum solicited potential investors, and the investors' lack of knowledge at the time of the investment, it is clear that investors did not have the necessary experience in oil and gas to manage their own investment.

The Court finds that the second *Williamson* factor has been established. Because the second *Williamson* factor proves the venturers' dependence of the efforts of Sethi Petroleum, the Court finds the third *Howey* element is established. *See Williamson*, 645 F.2d at 424. Accordingly, NDDF's venture is an investment contract and, therefore a security.

<u>The Third *Williamson* Factor: Venturers' Dependence on the Unique Capabilities of Sethi Petroleum</u>

Even if the first and second factors had not been satisfied, the third *Williamson* factor establishes that the venturers were completely dependent on Sethi Petroleum's efforts. Under this third factor a dependent relationship exists when the investors rely "on the managing partner's unusual experience and ability in running that particular business." *Williamson*, 645 F.2d at 423. As noted in *Williamson*, even a partner knowledgeable in the particular investment "may be left with no meaningful option when there is no reasonable replacement for the investment's manager." *Id.* In such a situation, "a legal right of control would have little value if partners were forced to rely on the manager's unique abilities*." Id.*; *see also Merch. Capital*, 483 F.3d at 763 ("[E]ven if the arrangement gives the partners some practical control, the instrument is an investment contract if the investors have no realistic alternative to the manager."). In assessing the third *Williamson* factor, a court may consider "the representations and promises made by promotors or others to induce reliance upon their entrepreneurial abilities." *Gordon v. Terry*, 684 F.2d 736, 742 (11th Cir. 1982); *see also Koch*, 928 F.2d at 1478.

The SEC argues that "Sameer and his company structured and operated the NDDF investment leaving investors completely dependent on the company's supposed entrepreneurial and managerial abilities, without any reasonable alternative management option" (Dkt. #195 at p. 21).

The summary judgment evidence establishes that Sethi Petroleum's cold call regime was built around touting the company's established relationships in the oil and gas industry and promising that the wells would produce one million barrels of oil per month from a major oil and gas company, that new investors would immediately begin receiving revenue checks, and that investments would return 30%–60% per year. Martin explicitly stated that he did not have

experience in the oil and gas industry except for a one-well project that never produced oil. After Martin spoke on the phone with Impini, he received an NDDF PPM and other documents. In the PPM, Sethi Petroleum touts its experience and ability to produce profit in the oil and gas industry, specifically in the Bakken Shale. The Executive Summary further states that the Bakken Shale area has been monopolized such that only major oil companies can participate in drilling. Due to Sethi Petroleum's purported experience and access to an exclusive market, the Court agrees that investors were "without any reasonable alternative management option."

Additionally, the SEC argues that "if NDDF investors somehow wrestled power away from Sethi Petroleum, they would have found . . . funds hopelessly commingled with [Sethi Petroleum's] own funds and those of other joint ventures" (Dkt. #195 at p. 21). Defendant argues in response that "a majority-in-interest of the investors could have voted down all actions taken by Sethi Petroleum and could have replaced Sethi Petroleum without cause" (Dkt. #211 at p. 23).

Other courts have held that investors were granted only illusory control over an investment where the enterprise was run by pooling investors' interests so that an individual investor had no control over the operation as a whole, even if he had some control over a subsidiary portion. *See, e.g.*, *Koch*, 928 F.2d at 1478, 1480; *Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918, 924–25 (4th Cir. 1990). In *Merchant Capital*, the Eleventh Circuit concluded that the partners had no realistic alternative to the current manager, as well as no actual power to remove him, because the manager "effectively had permanent control over each partnership's assets." 483 F.3d at 763; *see also Arcturus*, 171 F. Supp. 3d at 530 (Stating that "[t]he venturers had no access to their funds because the money was held in an account controlled exclusively by [the manager], not the Joint Venture.").

This is similar to the case at hand. The summary judgment evidence establishes that Sethi Petroleum took the investments, placed them in an account Sethi Petroleum exclusively controlled, and used the funds to pay for the costs associated with running Sethi Petroleum's office. Although the entire Sethi Enterprise was represented to include several different joint ventures, it was in reality a single enterprise with significant commingling of funds. Until January 2015, only Defendant had signatory power over the NDDF account. Defendant did not observe corporate formalities or otherwise keep the NDDF account separate from other Sethi Enterprise accounts. Furthermore, while the entire Sethi Enterprise raised approximately thirteen million dollars, less than $100,000 remained on the date of the receiver's appointment. Despite the receiver's efforts to sell the mineral interests actually owned by the Sethi Enterprise, no one has offered to buy the interest for cash. Additionally, when Martin asked for a refund of his investment, Cimoperlik refused to provide one, clearly indicating that NDDF venturers had no access to their funds.

These facts clearly indicate that even if Sethi Petroleum was replaced, the assets would not be accessible to the NDDF venturers. The SEC has submitted evidence that, just as in *Arcturus*, the venturers in the current case lacked any control over their money, which created a complete dependency on Sethi Petroleum.

The Court finds the third *Williamson* factor has been established. Because the third *Williamson* factor proves the venturers' dependence on the efforts of Sethi Petroleum, the Court finds the third *Howey* element is established. *See Williamson*, 645 F.2d at 424. Accordingly, the NDDF joint venture is an investment contract and, therefore, a security.

**Securities Fraud**

The SEC claims that Defendant made material misrepresentations including: (1) falsely describing Defendant's criminal history; (2) falsely describing Defendant's and Sethi Petroleum's regulatory history; (3) falsely claiming partnerships with major oil companies; (4) misrepresenting the scope of the NDDF venture; (5) misrepresenting expected returns; and (6) stating that investors funds would be used in accordance with the Operating Documents when, in reality, those funds were diverted for purposes not disclosed to investors. The Court finds that summary judgment should be granted only as to the misrepresentations of partnerships with major oil companies. Summary judgment is therefore denied for all other alleged misrepresentations.

To establish a prima facie case under Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, the SEC must prove by a preponderance of the evidence: (1) a misstatement or omission (2) of material fact (3) in connection with the purchase of a sale or security (4) made with scienter. *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009). Information is material if there is a substantial likelihood that disclosure of the misstated or omitted fact would have significantly altered the "total mix" of information to be considered by a reasonable investor. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The scope of this standard is determined by the relative status and sophistication of the parties. *Laird v. Integrated Res., Inc.*, 897 F.2d 826, 832 (5th Cir. 1990). Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Gann*, 565 F.3d at 936. Section 17(a)(2) and (3) require essentially the same elements, but do not require scienter. *See SEC v. Evolution Capital*, 866 F. Supp. 2d 661, 667 (S.D. Tex.

2011). Since the SEC must essentially prove the same elements for each violation, the Court will consider these allegations together. *See Arcturus*, 171 F. Supp. 3d at 535.

The SEC argues Defendant intentionally made a material misstatement when he told investors that Sethi Petroleum had partnerships with major oil companies (Dkt. #195 at pp. 25–28). Defendant argues that any misstatements were not material because the "total mix of information" included cautionary language, the statements were predictive, insufficient time had elapsed, and unfavorable market conditions intervened (Dkt. #211 at pp. 12, 24). Based on these facts, Defendant argues that a reasonable inference in his favor would lead to the conclusion that these were not actionable misrepresentations. The Court finds that despite hedging and cautionary statements in parts of the offering documents, the "total mix" of information based on the relative sophistication between Sethi Petroleum and its investors was that these relationships were currently existing, and that larger relationships may develop as the investors pour in.

Defendant, individually and through Sethi Petroleum, unequivocally advertised to the world that Sethi Petroleum presently "works with companies such as ExxonMobil and Hess in big oil and gas plays in the Bakken [Shale]" (APP476). The very first interaction that investors have with Sethi Petroleum is through a cold call. The Sethi Petroleum script for its salespeople states: "We're partnered directly with a couple of HUGE, PUBLICLY traded companies like Conoco Phillips, Continental, GMXR just to name a few" (APP480). Salespeople pursue investors solely on the basis of the investor being "accredited," which has nothing to do with actual experience in the oil and gas industry or even investing in general. Once an investor expresses interest, the salesperson sends offering documents including the PPM and Executive Summary. The Executive Summary states:

> [T]his area has become monopolized, allowing only major oil companies to
> participate in the Bakken Shale developments . . . Sethi Petroleum is working

directly with major oil companies, operators, landmen, service crews, landowners, mineral rights owners, and royalty owners thus gaining ground floor access to developmental opportunities in both the Bakken Shale and the Three Forks formations.

(APP204). The Executive Summary goes on to describe the extent of Sethi Petroleum's operations as "rights and options to drill in more than 200,000 available net acres of land in North Dakota" (APP204). Later, it ambiguously states "all of our wells will be drilled by publicly traded and/or major oil and gas companies" (APP204). Given the unequivocal preceding statements, it would not be reasonable to infer that the final statement about major oil and gas companies is simply a predictive statement of "hoped-for major operators" (Dkt. #211 at p. 12). Rather, Sethi Petroleum, by using the word "directly" in the present tense, led NDDF investors to believe that it was currently working with major companies to establish a direct link to profit.

Further removing doubt as to the misstatement regarding major oil and gas relationships are the unofficial statements made in the press and on social media about Sethi Petroleum's business. A "D Magazine" article about Defendant stated that "the company works with companies such as ExxonMobil" (APP476). A Craigslist listing seeking investors states among the documents that it will send a list of "Partnerships with the major Oil and Gas companies" (APP482). Finally, Defendant's own LinkedIn page describes his company as having "ground-floor investment opportunities managed and operated by major oil or publically traded energy companies" (APP486). Each of these statements would lead a reasonable investor to believe that Sethi Petroleum had present relationships with major oil and gas companies at the time that the statements were made. In fact, Sethi Petroleum only had interests with Irish Oil & Gas, Inc., a small, private oil company. The unrebutted evidence regarding Sethi Petroleum's mischaracterization of its relationships with major oil and gas companies proves that there is a substantial likelihood that disclosure would have significantly altered the "total mix" of

information to be considered by a reasonable investor. Thus, the first and second elements of a violation of the anti-fraud provisions are established.

To establish the third element, the SEC must prove that the misstatement was made in connection with the sale or purchase of a security. This element is met if the misstatement 'somehow touches upon' or has 'some nexus' with 'any securities transaction.' *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (quoting *SEC v. Clark*, 915 F.2d 439, 449 (9th Cir. 1990)). The purpose of Sethi Petroleum misstating its relationship with major oil and gas was to sell its securities. This is sufficient to satisfy the "in connection with" requirement. *See Clark*, 915 F.2d at 449. Therefore, the SEC has established the third element of securities fraud.

To establish the fourth element, the SEC must prove that Defendant acted with scienter. In the Fifth Circuit, scienter may be established by showing that the defendant acted intentionally or with severe recklessness. *See Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981) (en banc). Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it. *Id.* The Executive Summary stated that the Bakken Shale area "has become monopolized, allowing only major oil companies to participate" (APP204). The following statement that "Sethi Petroleum is working directly with major oil companies" would obviously create a danger of misleading investors into thinking that the NDDF venture is a viable investment. Defendant has not produced any argument or evidence disputing this point or that such relationships in fact existed. Therefore, the SEC has proved that Defendant acted with at

least severe recklessness. Having found that Defendant acted with scienter with regard to the statements about relationships with oil companies, Defendant has violated Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.

To establish a violation of Section 17(a)(2) or 17(a)(3), the SEC need only make a showing of negligence in connection with Defendant's sale of securities. *Meadows v. SEC*, 119 F.3d 1219, 1226 n.15 (5th Cir. 1997). The Court has already determined the evidence conclusively establishes Defendant acted with scienter. Therefore, the Court finds the summary judgment evidence supports a finding that Defendant violated Sections 17(a)(2) and 17(a)(3).

To establish joint and several liability, the SEC must prove that Defendant is a control person or acted through or by means of another person. To establish that Defendant is a control person under Section 20(a) of the Exchange Act, the SEC must show an underlying violation and that person's control of the violating entity. 15 U.S.C. § 78t(a). The SEC argues that Defendant is a control person of Sethi Petroleum because Defendant was Sethi Petroleum's President and sole Managing Member (Dkt. #195 at p. 28). Defendant created, owned, managed, and controlled the company's operations from at least November 7, 2011, until May 2015. This unrebutted evidence is sufficient to show that Defendant had control of Sethi Petroleum when the misstatements were made. Therefore, Defendant is jointly and severally liable with and to the same extent as Sethi Petroleum for the fraudulent sale of securities.

Further, Defendant is jointly and severally liable for violating the antifraud provisions through or by means of another person. 15 U.S.C. § 78t(b). Defendant directed his salespeople to tell potential investors that Sethi Petroleum is "partnered directly" with major oil companies such as Conoco Phillips and Continental. Further, he directed the author of the Executive Summary to state similar misstatements about direct relationships with major oil and gas companies.

Defendant is therefore jointly and severally liable for directing others to make misstatements in violation of the federal securities laws.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff Securities and Exchange Commission's Motion for Summary Judgment as to Sameer Sethi (Dkt. #195) is hereby **GRANTED**.

The Court finds that Sameer Sethi is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The Court further finds that Sameer Sethi is jointly and severally liable with and to the same extent as Sethi Petroleum under Section 20(a) of the Exchange Act for Sethi Petroleum's Exchange Act violation. The Court further finds that Sameer Sethi is liable for violations of Section 17(a) of the Securities Act.

The Court hereby withdraws its previous Memorandum Opinion and Order (Dkt. #232) and enters this order in its place.

**SIGNED this 17th day of January, 2017.**


AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE